249 A.2d 421.

STATE *vs.* THOMAS RICHARD KNOTT, JR.

JANUARY 23, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

Roberts, C. J.   This indictment, charging the defendant with murder, was returned after jurisdiction of the defendant, at the time a juvenile, had been waived by the family court.   Because the competency of the defendant to stand trial under this indictment was not determined until sometime in 1965, trial was not had until February 1, 1966.  At the conclusion thereof, the jury returned a verdict of murder in the first degree, and in April 1966 the defendant was sentenced to imprisonment for life.   He now prosecutes a bill of exceptions in this court.

It is not disputed that on December 22, 1961, Nancy Ann Frenier had driven her husband to his place of employment in the family car, intending to then proceed to a laundromat.   Late that day Mr. Frenier reported his wife missing, and police later located the family car in East Providence. A laundry basket with laundered clothes, along with a paper bag from Mammoth Mart, a department store located in East Providence, were found in the car.   Police investigation disclosed that a man and a girl had been observed walking from the car toward a nearby reservoir and that a woman was heard to cry out in distress.   A police search of the area was made, but nothing other than the car was found.

In March 1962, after the ice melted in the reservoir, a search was conducted, and a mutilated body was found in the water.   Some jewelry found on the partially nude body matched the description of jewelry which Nancy Ann Frenier was wearing when last seen alive, and thereafter the police considered the death to be an unsolved homicide. The body had been, as is mentioned above, considerably mutilated, and it appears that from March 19, 1962, when the body was found, to January 26, 1963, no publicity was released by the police as to the condition of the body.

In January 1963, a housewife residing in South Attleboro, Massachusetts, had been found dead in her home.  Shortly

thereafter, the record discloses, a detail comprising Pawtucket and Attleboro police officers went to a theater in Pawtucket where they maintained a watch outside the lobby. Shortly thereafter they took defendant into custody after leaving the theater in the company of his father and mother. He was taken to police headquarters in Pawtucket, where he was separated from his parents and taken into the office of the deputy chief of the department. There he was questioned by a Sergeant Joseph P. Barry, who testified that defendant had been brought to the station on a matter entirely unconnected with the death of Nancy Ann Frenier. He further testified that he had given defendant no warning as to his right to remain silent or to have the assistance of counsel. According to Sergeant Barry, while he was in conversation with defendant concerning *an unrelated matter*, defendant blurted out, "I killed Nancy Ann Frenier."

The sergeant testified that he had only a general knowledge concerning the circumstances of the Frenier homicide and that at the time he questioned defendant he was not investigating that case. The Frenier case, he testified, "* * * was the furthest thing from my mind that night." After questioning defendant concerning his identity and that of his father and mother, he inquired as to what school he attended. At that time he saw that defendant had a Band-Aid on his finger and questioned him as to what had happened to his finger. He further testified that he saw a scratch on defendant's neck and, after asking about it, defendant replied that he couldn't remember where he got it.

The sergeant then directed defendant to strip to his waist and, observing scratches on defendant's shoulder, inquired about them. The defendant was then asked to remove his shoes, which he did, and the sergeant, after examining the shoes, asked him "* * * to explain the condition of the

shoes." According to Sergeant Barry, defendant gave him an answer which was directly related to the incident concerning which he was being interrogated but then, continuing on, blurted out that he had killed Nancy Ann Frenier. At this point Sergeant Barry testified that he left the interrogation room and reported this development to Lieutenant Joseph Roy, his superior officer. Lieutenant Roy testified that he took over the interrogation but, because of defendant's emotional state, did not ask him any questions about the Nancy Ann Frenier death for some time. According to the lieutenant, defendant, without any questioning, stated that he had killed Nancy Ann Frenier and described in detail the circumstances under which the homicide took place. Thereafter, according to Lieutenant Roy, defendant sat silent and without moving for a period of up to five hours.

Early on the morning of January 27 the Pawtucket police turned defendant over to a Captain Theodore C. Hilton of the East Providence police, who admitted that he had been in charge of the Frenier homicide. He testified that he considered Knott a suspect in that case, but concedes that he did not advise defendant that he had a right to the assistance of counsel or to remain silent under interrogation. Captain Hilton further testified that he took defendant from the Pawtucket police station to the state police barracks at Scituate on the morning of January 27, 1963. Upon arriving at the state police barracks, according to Captain Hilton, defendant told him that he wanted to talk about the Frenier girl and thereafter, without being questioned by the captain, made a series of incriminating statements involving himself in her death.

The trial justice, in substance, found that all of the incriminatory statements attributed to defendant were voluntarily and spontaneously made at a time when he was not under custodial interrogation as a suspect in the Frenier

case and ruled, therefore, that the statements made to the police were admissible. The thrust of the state's contention in this court is that the statements were made during an interrogation of defendant regarding a matter entirely unrelated to the Frenier case so that suspicion had not focused on defendant with respect to the Frenier slaying nor was he being interrogated for the purpose of eliciting incriminatory statements concerning that case. Of course, defendant contends, first, that he was undergoing a custodial interrogation by the Pawtucket police as a suspect in the Frenier case but that, in any event, he was entitled to the *Escobedo* fifth amendment warning when a custodial interrogation of him began concerning the purportedly unrelated matter, that is, the Attleboro slaying.

In *Escobedo* v. *Illinois,* 378 U. S. 478, 490, 84 S. Ct. 1758, 1765, 12 L.Ed.2d 977, 986, the court held that confessions or other incriminatory statements obtained from a suspect by the police during an interrogation while he is in custody are inadmissible in evidence in a subsequent prosecution where the accused's request for the assistance of counsel has been denied and the police have not effectively informed the accused of his right to remain silent under the interrogation. The precise language of the holding, in pertinent part, reads that when "* * * the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright,* 372 U. S., at 342, and that no statement elicited by the police during

the interrogation may be used against him at a criminal trial."

The very phrasing of the rule as stated in *Escobedo* gives rise to the antecedent question whether, absent an express request on the part of the accused for the assistance of counsel, it remains obligatory upon the police to effectively warn him of his fifth amendment right to remain silent under interrogation. In other words, we turn to consider whether under *Escobedo* an accused who has not requested the assistance of counsel must still be warned by the police of his right to remain silent if confessions or admissions obtained from him are to be admitted at a subsequent prosecution. In a number of jurisdictions the courts have held that the *Escobedo* rule is without application unless the accused has first, in express terms, requested the assistance of counsel retained by him or by his family to consult with him. However, there is a respectable line of authority which holds that the request for the assistance of counsel is not a condition precedent to the obligation of the police to provide the accused with notice of his right to remain silent. An extensive discussion of this issue may be found in 79 Harv. L. Rev. 935, at 996 et seq.

No useful purpose would be served by an extended discussion of the pros and cons on that issue. Our conclusion is that the real thrust of the rule stated in *Escobedo* is to insure to an accused notice of his fifth amendment privilege to remain silent under interrogation, whether this be given him by counsel or by the police who have him in custody. Because we take this view, we hold that it is obligatory upon the police to inform an accused of his right to remain silent in any case where his request for the assistance of counsel has been denied or where the accused failed to request the assistance of counsel.

The contention upon which the state relies is that defendant, at the time he was with Sergeant Barry, was not a person upon whom suspicion had focused with respect to

the Frenier slaying nor one who was being interrogated for the purpose of eliciting incriminatory admissions concerning that crime. Rather, according to the state, at that time defendant was being interrogated with respect to an entirely unrelated matter, obviously the South Attleboro slaying. Therefore, it is argued, his statement to Sergeant Barry must be considered as having been made spontaneously concerning a crime other than the crime about which he was being interrogated. This is an ingenious argument and was vigorously pressed. However, we are unable to accept it as sound in the factual circumstances of this case.

Many courts have held that the exclusionary rule stated in *Escobedo* is without application when the admissions of the accused were not made by a person under interrogation designed to elicit incriminating statements with respect to his participation in the crime under investigation. The statements in question have been considered to be spontaneous declarations to which the *Escobedo* rule is not to be applied, the courts having reasoned that the police are under no obligation to halt personal disclosures made freely and voluntarily and that do not result from any overbearing on the part of the police.

In *Miranda* v. *Arizona,* 384 U. S. 436, 478, 86A S. Ct. 1602, 1630, 16 L.Ed.2d 694, 726, the court said: "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility

is not affected by our holding today." The effect of this language in *Miranda* has undoubtedly been to persuade many courts to draw rather tenuous distinctions between the spontaneous declarations, so called, and incriminating admissions elicited during interrogation.

We have examined the cases to which the state refers as sustaining its contention that the statement of defendant constituted a spontaneous declaration and is without the scope of the *Escobedo* rule. Particularly, we have examined *Commonwealth* v. *Eperjesi*, 423 Pa. 455, 224 A.2d 216, and *Hammond* v. *State*, 244 Ark. 1113, 428 S.W.2d 639. Under the rule contended for by the state, these cases may well be examples of spontaneous declarations. We are unable to agree that in the instant case the declaration of defendant to Sergeant Barry was a spontaneous declaration pursuant to the fact situations in those cases.

In *Eperjesi* the defendant had been suspected of participating in the death of two small boys, had been in custody, interrogated and given a lie-detector test, after which she was cleared of complicity and released from custody and no longer considered a suspect. Thereafter, she had approached a police officer who was continuing the investigation, asked him into her home, and had stated to him that she had caused the death of the two boys.

In the instant case defendant had been taken into custody shortly after the South Attleboro slaying had taken place. The investigating police officers had driven by defendant's home to determine the color and type of car his parents used, and later had taken him into custody. It is difficult to read the record as to the inquiries being made of this defendant by Sergeant Barry without being convinced that the sergeant was conducting a thorough investigation of the South Attleboro slaying, at least.

At this point defendant had been, since the Frenier slaying, a prime suspect in that crime and now in the South

Attleboro crime. In other words, he was involved in a sequence of criminal acts or a pattern of criminal conduct and, of course, should have been given the *Escobedo* warning when that interrogation started. This is not a situation where the defendant, on being taken into custody, blurted out an incriminating statement, or, after having been released from interrogation, went back and voluntarily started to inform the police of his participation in the crime.

In short, it is our opinion that realism demands that we recognize that in no manner or form did this defendant himself of his own volition, uninfluenced by the circumstances in which he found himself at that time, undertake to admit his participation in the death of the Frenier girl to Sergeant Barry. We hold that in the circumstances here the state's contention that the investigation was as to an unrelated matter is untenable and that the constitutional right of the defendant to remain silent pursuant to the fifth amendment is violated and that the statements made to Sergeant Barry and Lieutenant Roy were improperly admitted into evidence. Because we are of the opinion that a new trial must be had in this case, we refrain from passing upon the question of whether the disclosures made by defendant to Captain Hilton of the East Providence police were spontaneous declarations and, therefore, outside of the scope of *Escobedo*.

We apply the *Escobedo* rule in this case with no small reluctance. It is clear from the record here that the interrogation during which defendant made the incriminating statements was conducted a year and a half before the annunciation of the rule in *Escobedo,* namely, June 22, 1964. We are fully aware that the police officers involved in a custodial interrogation conducted in January 1963 cannot fairly be charged with a knowledge of the limits upon their interrogatory authority by a rule, the annunciation of which was still some 17 months in the future. In *Johnson* v. *New*

*Jersey*, 384 U. S. 719, 733, 86A S. Ct. 1772, 1781, 16 L.Ed.2d 882, 892, the supreme court held that the rulings in both *Escobedo* and *Miranda* were to have a limited retrospective application, saying: "* * * we conclude that *Escobedo* and *Miranda* should apply only to cases commenced after those decisions were announced." The decision in *Escobedo* was announced June 22, 1964.

*Johnson* clearly establishes the extent to which the rules laid down in *Escobedo* and *Miranda* shall have retroactive application. At the same time it establishes the time at which the constitutional right vests in the accused to be advised either by counsel or by the police that he may remain silent under interrogation. The court in *Johnson* held that the rule in *Escobedo* would apply where the trial of the defendant commenced after June 22, 1964. Because the competency of the defendant to stand trial was not determined until after that date, it is clear that this trial, commencing in 1966, is one in which we have no alternative but to apply the rule stated in *Escobedo* and to hold that the information disclosed by the defendant during the interrogations by Sergeant Barry and Lieutenant Roy were inadmissible for failure to comply therewith.

The exceptions of the defendant to the rulings admitting into evidence statements he made to the members of the Pawtucket police department are sustained, the judgment below is reversed, and the case is remitted to the superior court for a new trial in accordance with this opinion.

*Herbert F. DeSimone,* Attorney General, *Donald P. Ryan,* Assistant Attorney General, for plaintiff.

*James Cardono,* Public Defender, *William F. Reilly,* Special Counsel to the Public Defender, for defendant.