302 A.2d 64.

STATE *vs.* THOMAS RICHARD KNOTT, JR.

MARCH 22, 1973.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

ROBERTS, C. J. On February 6, 1963, the defendant was indicted and charged with the murder on December 22, 1961, of Nancy Ann Frenier in the city of East Providence. At the time of the alleged homicide, the defendant was a minor, and shortly after his arrest on January 26, 1963, he appeared before the Family Court on January 28, 1963, which court, after a hearing, waived jurisdiction. Thereafter, the present indictment was returned. The defendant was not deemed competent to stand trial until sometime in 1965. The trial started on February 1, 1966, in the Superior Court, and the jury returned a verdict of guilty. The defendant then proceeded to prosecute a bill of exceptions in this court.

In an opinion dated January 23, 1969, this court sustained certain exceptions of defendant to rulings admitting into evidence statements that he was alleged to have made to two members of the Pawtucket police department on the night of January 26, 1963. In so acting, we noted that the thrust of the rule stated in *Escobedo* v. *Illinois,* 378

U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), was to insure to an accused notice of his fifth amendment privilege to remain silent under interrogation, whether this be given to him by counsel or by the police who have him in custody. Since the record indicated that at no time had defendant been informed by the interrogating Pawtucket police officers that he had a right to remain silent and had a right to the assistance of counsel, we said: "* * * we hold that it is obligatory upon the police to inform an accused of his right to remain silent in any case where his request for the assistance of counsel has been denied or where the accused failed to request the assistance of counsel." *State v. Knott,* 105 R. I. 71, 76, 249 A.2d 421, 424 (1969). The judgment of the trial court was reversed, and the case was remitted to the Superior Court for a new trial in accordance with the opinion. *State* v. *Knott, supra.*

We consider it significant that we elected to order a new trial after concluding that the admission of the statements defendant made on the night of January 26 to two Pawtucket police officers violated his constitutional right to be given the warnings mandated by *Escobedo*.[1] We expressly

---

[1]In our first *Knott* opinion, we held that *Escobedo* only, and not *Miranda* v. *Arizona,* 384 U. S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), applied on the basis of the decision in *Johnson* v. *New Jersey,* 384 U. S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1965), which said *Escobedo* applies to all trials begun after June 22, 1964, and *Miranda* applies only to cases where the trial began after June 13, 1966. Since Knott's first trial began on February 1, 1966, only *Escobedo* applied in the first trial. Subsequently, in *Jenkins* v. *Delaware,* 395 U. S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969), the Court held that *Miranda* was not applicable to post-*Miranda* retrials of cases originally tried prior to *Miranda.* Thus, for purposes of this opinion, only the decision in *Escobedo* is applicable. As we said in our prior opinion, we apply the *Escobedo* rule with no small reluctance. In fact, subsequent to oral argument, the United States Supreme Court granted certiorari to review the rule in *Johnson* v. *New Jersey, supra. Pennsylvania* v. *Ware,* 405 U. S. 987, 92 S.Ct. 1254, 31 L.Ed.2d 453 (1972). We delayed consideration of this case pending the outcome of the Supreme Court's decision. However, the Supreme Court later vacated the order granting certiorari. 406 U. S. 910, 92 S.Ct. 1606, 31 L.Ed.2d 821 (1972).

stated that because evidence of the two statements made by defendant to the Pawtucket police was improperly admitted, a new trial should be granted. We went on to say: "* * * we refrain from passing upon the question of whether the disclosures made by defendant to Captain Hilton of the East Providence police were spontaneous declarations and, therefore, outside of the scope of *Escobedo*." *State* v. *Knott, supra,* at 79, 249 A.2d at 425.

The retrial of defendant began on April 6, 1970, before a justice of the Superior Court sitting with a jury, and on April 15, 1970, a verdict was returned of guilty of murder in the first degree. The defendant is again prosecuting a bill of exceptions in this court. In view of the thrust of defendant's exceptions, we deem it advisable to briefly review the facts disclosed in the record.

On December 22, 1961, Mr. Frenier reported his wife, Nancy Ann Frenier, missing. Subsequently, the car used by Mrs. Frenier was found near the East Providence reservoir. However, it was not until March, 1962, after the ice had melted in the reservoir, that the mutilated body of Nancy Ann Frenier was found in the water.

The defendant was a prime suspect in this case from its beginning. He had been taken into custody and questioned by Captain Theodore C. Hilton of the East Providence police immediately after the body was found. Thereafter, on April 10, 1962, defendant was taken to the state police barracks at Scituate. He was interrogated on this occasion for some time and was finally released from custody on April 11, 1962. The defendant was again taken into custody about 10 p.m. on the evening of January 26, 1963, in the course of an investigation of the death in early January of a housewife in South Attleboro being conducted jointly by the Pawtucket and Attleboro, Massachusetts, police. He was taken to police headquarters in the city of Pawtucket.

He was first interrogated by Sergeant Joseph P. Barry of

the Pawtucket police, who testified that he was questioning defendant concerning the South Attleboro homicide when defendant suddenly blurted out: "I killed Nancy Ann Frenier." Sergeant Barry concedes that he had given defendant no warning concerning his right to the assistance of counsel during custodial interrogation or of his right to remain silent during such interrogation. After this admission had been made, Sergeant Barry referred the matter to his superior, Lieutenant Joseph Roy.

It appears from the evidence that Lieutenant Roy proceeded to interrogate defendant. He testified that after they had been talking about a half hour defendant spontaneously blurted out that he had killed Nancy Ann Frenier and described in some detail the circumstances of the homicide. Lieutenant Roy also concedes that he had never advised defendant as to his constitutional rights. Lieutenant Roy further testified that, after confessing his guilt, defendant sat for a period of up to five hours silent and without moving. Both the incriminatory statements made to Sergeant Barry and to Lieutenant Roy were admitted into evidence in the course of the first trial of this defendant.

We reiterate that we ordered a new trial in this case on the basis of the admission into evidence at the first trial of the two statements made to the Pawtucket police officers who did not comply in any manner with the mandate of *Escobedo*. We also emphasize that in ordering a new trial on this ground, we made it clear that we were refraining from passing on the propriety of the admission into evidence at the first trial of defendant's statement made to Captain Hilton at the state police barracks on the morning of January 27. We turn, then, to review the facts and circumstances under which defendant made an incriminatory statement or admission to Captain Hilton at the state police barracks.

There is testimony that defendant was not interrogated from midnight to about 5 a.m. on the morning of January 27, 1963. According to that testimony, he simply sat silent in a chair, staring at the wall. About 5:45 a.m. on January 27, the Pawtucket police gave Captain Hilton custody of defendant.

Captain Hilton proceeded to secure defendant with handcuffs, and they entered a state police car in company with Lieutenant Morgan of the state police and an unidentified trooper. They drove to the state police barracks in Scituate, Rhode Island. The trip took about 25 to 30 minutes. According to the testimony, no conversation occurred between Hilton and defendant until shortly before they arrived at the state police barracks. At that time defendant asked Captain Hilton: "Captain, where are we going?" To this inquiry Hilton replied: "We're going to Scituate state police barracks." This was the only conversation between Hilton and defendant during this trip.

At the state police barracks they went to an office occupied by Lieutenant Morgan, where defendant was freed of his handcuffs and allowed to sit down. At this time the sun was rising, a fact which defendant concedes. At this point defendant said to Captain Hilton: "I'd like to speak to you alone." The Captain then requested Lieutenant Morgan to leave, which the trooper did. Hilton sat in a chair opposite defendant, who then proceeded to confess in detail to the Frenier murder without any interruption by Hilton. The defendant talked for about 15 to 20 minutes, and Captain Hilton asked no questions of him. Captain Hilton concedes that he had not at any time given defendant the warnings as to his rights to the assistance of counsel and to remain silent as mandated in *Escobedo*.

The defendant raises the admission in evidence of these statements to Hilton in the course of the retrial as the prime issue to be considered by this court. The defendant

now contends vigorously that the admission of such evidence was in violation of his constitutional rights. He argues, first, that the Hilton confession was obtained from him without his being informed by Captain Hilton of his right to the assistance of counsel and his right to remain silent as mandated by *Escobedo*. Secondly, he argues that the Hilton confession was "tainted" in that it was the direct result of the constitutionally impermissible interrogations at Pawtucket police headquarters on January 26.

The defendant's first contention is that the Hilton confession was inadmissible because it was made without the *Escobedo* warnings having been given to him at any time prior to his arrival at the state police barracks, and it is conceded that none were given to him by Captain Hilton at the barracks. The state's contention is that the Hilton confession was made spontaneously by defendant to Captain Hilton at the state police barracks at a time before any interrogation had been commenced by Captain Hilton.

This contention requires our consideration of the conditions and circumstances under which defendant uttered the Hilton confession. It appears from the evidence in the record that defendant's interrogation at Pawtucket police headquarters had ended shortly before midnight on January 26 and that it was not until about 5:45 a.m. on the morning of the 27th that he was taken into custody by Captain Hilton and driven to the state police barracks. From the credible evidence, it appears that there was no conversation during the ride to the barracks other than a single question directed to Captain Hilton by defendant concerning the destination of the trip.

The evidence discloses that after they entered the state police barracks and had just been seated in the office of Lieutenant Morgan, defendant asked Captain Hilton if he could see him alone. Lieutenant Morgan left the room at Captain Hilton's request, and at that point defendant

began a recital of the facts and circumstances under which he had killed Nancy Ann Frenier. The evidence also reveals that up to that time Captain Hilton had asked no questions whatsoever of defendant concerning the death of Nancy Ann Frenier. The trial justice, while expressly stating his acceptance of Captain Hilton's testimony as true, has also pointed out in his decision that because of a number of inconsistencies, he did not believe defendant, and this rejection of credence to defendant clearly included his testimony concerning the absence from his memory of his trip to the state police barracks.

The trial justice, on the basis of this evidence, concluded that defendant's confession to Captain Hilton was spontaneous and voluntary and was made before any process of interrogation had been commenced by Captain Hilton of defendant. He further notes that Hilton's testimony is corroborated by that of Lieutenant Morgan.

It is our opinion that on the basis of the facts, the statements of defendant to Captain Hilton at the state police barracks were not made during the course of an interrogation and consequently were voluntary and spontaneous as the state contends. Neither the *Escobedo* nor *Miranda* decisions ever were intended to preclude the admission of voluntary confessions: "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our

holding today." *Miranda* v. *Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). The introduction of the Hilton confession into evidence was not improper inasmuch as the *Escobedo* mandate was not applicable in the circumstances. *United States* v. *DeBose,* 410 F.2d 1273 (6th Cir. 1969); *Bazzell* v. *State,* 6 Md.App. 194, 250 A.2d 674 (1969); *Commonwealth* v. *Brown,* 438 Pa. 52, 265 A.2d 101 (1970).

We turn next to defendant's contention that the Hilton confession was tainted by the earlier Pawtucket confessions. After a study of defendant's brief, we are persuaded that he is asserting that the statements he made to Pawtucket police on January 26 were a product of psychological and physical coercion. He has assumed that in its prior opinion this court held the confessions to the Pawtucket police inadmissible not solely because of the failure to give the *Escobedo* warnings, but also because they were involuntarily produced by psychologically and physically abusive police interrogation techniques. He contends that the continuity of the coercive circumstances under which the Pawtucket confessions were obtained was productive of his confession to Captain Hilton. On this ground, he urges that his confession to Captain Hilton was "tainted" and admitted in violation of his constitutional rights.

We think it is important in rejecting this contention to point out that this court in its prior opinion and the trial justice in the present case found no coercive pressures, psychological or physical, exerted upon defendant while in the custody of the Pawtucket police. For purposes of this case we distinguish between confessions inadmissible due to a failure to administer *Escobedo* warnings and those inadmissible because physically or psychologically coerced. The distinction is important because the issue is not whether the Pawtucket confessions were freely made but whether the Pawtucket confessions tainted the Hilton confession.

The Hilton confession would be tainted if the circumstances which produced the Pawtucket confessions lingered on to render the confession to Hilton involuntary.

The United States Supreme Court in *Escobedo* and *Miranda* indicated that any confession obtained without administering the proper warnings is considered to be involuntary and, therefore, must be excluded. In our view, by applying the exclusionary rule, these opinions established a prophylactic rule designed to prevent coercive police tactics and to insure that the proper constitutional warnings are given to an accused. Mr. Justice Harlan has said that the "* * * exclusionary rule is but a remedy which, by penalizing past official misconduct, is aimed at deterring such conduct in the future." *Mapp* v. *Ohio,* 367 U.S. 643, 680, 81 S.Ct. 1684, 1705, 6 L.Ed.2d 1081, 1104 (1961) (dissenting opinion). We do not feel that implicit in *Miranda* or *Escobedo* is an assumption that in every instance of a confession made without warnings the police had resorted to coercive tactics. Thus, the lingering effect of failing to properly warn a defendant of his constitutional rights may be substantially different from the lingering effect of psychologically and physically abusive police interrogation tactics. For this reason the circumstances rendering the Pawtucket confessions inadmissible are essential in determining if those confessions tainted the confession to Captain Hilton. Therefore, we think it is important to review extensively our prior decision and the findings of the trial justice to demonstrate that only the failure to administer to defendant his *Escobedo* warnings rendered the Pawtucket confessions constitutionally inadmissible.

During the prior trial the state contended that defendant's interrogation at Pawtucket police headquarters was not directed to the Frenier slaying but to an unrelated matter, obviously meaning the South Attleboro slaying.

The prosecution argued at that trial that the statement made to Sergeant Barry must be considered to have been made spontaneously by defendant, it being clear, according to the state, that he was not being interrogated at that time concerning the murder of Nancy Ann Frenier.

We rejected this argument. We noted that defendant was under suspicion with respect to both crimes or, to put it otherwise, had engaged in a pattern of criminal conduct which involved both slayings. We held that in those circumstances, interrogation had clearly started at the time the first admission was made to Sergeant Barry and that interrogation was constitutionally impermissible absent his being informed of his right to the assistance of counsel and to remain silent as mandated in *Escobedo*.

The state's contention at that time rested on the fact that after *Escobedo* many courts had held that the exclusionary rule mandated therein was without application when the accused made incriminatory statements to interrogators at a time when he was not under interrogation. In such circumstances, such courts reasoned, the statements were of spontaneous origin and *Escobedo* would have no application. The theory was that the police are under no obligation to halt personal disclosures being freely and voluntarily made that do not result from any overreaching on the part of the police. This rule was subsequently announced in *Miranda* v. *Arizona, supra,* at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

With respect to the Pawtucket confessions, we said in our prior opinion that this was not a situation where the defendant, upon being taken into custody, blurted out incriminating statements, or, after having been released from interrogation, went back and voluntarily started to inform the police of his participation in the crime. We said specifically at 105 R. I. 79, 249 A.2d at 425: "In short, it is our opinion that realism demands that we recognize that in

no manner or form did this defendant himself of his own volition, uninfluenced by the circumstances in which he found himself at that time, undertake to admit his participation in the death of the Frenier girl to Sergeant Barry." We then went on to hold that in the circumstances "* * * the state's contention that the investigation was as to an unrelated matter is untenable and that the constitutional right of the defendant to remain silent pursuant to the fifth amendment is violated and that the statements made to Sergeant Barry and Lieutenant Roy were improperly admitted into evidence."

The defendant construes our language with reference to the Pawtucket confessions as concluding that those statements made on the night of January 26 were coerced and, therefore, were involuntary. We cannot agree. We were simply indicating that we did not accept the state's contention that the investigation was to an unrelated matter, the South Attleboro homicide, and that, therefore, the defendant was not under interrogation concerning the Frenier homicide. We cannot on the basis of that language agree with defendant that the Pawtucket confessions had been involuntary by reason of coercion and were inadmissible. We think the record makes it clear that in the first *Knott* opinion we held that the statements made by defendant to the Pawtucket police were inadmissible by reason of the failure on the part of the Pawtucket police to warn him of his right to the assistance of counsel and his right to remain silent as mandated by *Escobedo*. We cannot draw from that language a conclusion that we were holding those confessions inadmissible because they were involuntarily made as a result of abusive police tactics.

The defendant's challenge to the voluntariness of the Hilton confession, though, is that it derived from and was a result of the coercion through which the Pawtucket confessions were induced the night before, or, in other words,

that the Hilton confession was the "fruit of the poisonous tree."

The Supreme Court of the United States has never held that one inadmissible confession automatically precludes the use of subsequent confessions. What is required is that the later confessions meet the test of voluntariness. *Lyons* v. *Oklahoma,* 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944). When the conditions which made the first confession inadmissible have been removed, the second confession will be admitted. *United States* v. *Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947). In short, the subsequent confession must be insulated from the effects of the prior illegality. In order to make a later confession admissible, it is necessary to establish a "break in the stream of events" between the first illegally obtained confession and subsequent statements. If such a break is not found, the later confessions cannot be sequestered from all that went before, and hence they are inadmissible. *Darwin* v. *Connecticut,* 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968); *Clewis* v. *Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

One rationale for finding that a subsequent confession is tainted by a previous illegally obtained confession is that if the first confession results from physical or psychological coercion, the fear generated by such coercion may linger in the defendant's mind and prevent a later confession from being truly voluntary. In other words, the later confession is simply a part of one continuous coercive process. *Leyra* v. *Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); *Beecher* v. *Alabama,* 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967). A contention that such a coercive process compelled defendant to confess to Hilton is not supportable on the facts of this case.

Here the trial justice found that the Pawtucket confessions were voluntary in that they were free from any coer-

cive influences. The trial justice clearly voiced his rejection of the credibility of defendant during the hearing to suppress the Hilton confession: "I don't believe that defendant's testimony that there were about thirty policemen in the room when he went in; that he was in the nude while being interrogated, although at one point, he had his shirt and shoes off; and that threats by the Attleboro policemen were made concerning the electric chair. In short, I find the defendant's testimony rather incredible in many respects." He further found that defendant in fact knew what was going on at Pawtucket police headquarters and that his testimony concerning the clothes he was wearing persuaded him that he had not been telling the truth concerning the conditions that accompanied his confessions. He went on to hold: "* * * I find that the confessions given by the defendant to the Pawtucket police were not coerced in any way. They were free and voluntary confessions made by the defendant to the Pawtucket police."

The question of whether a confession made subsequent to an illegally obtained confession is voluntary and not subject to the coercive influence of the first confession is an issue for the triers of fact and the mere fact that there is evidence that would justify a conclusion contrary to that reached by the fact triers is immaterial. *Lyons* v. *Oklahoma, supra.* In view of the finding of the trial justice that the Pawtucket confessions were not involuntary by reason of coercion, our conclusion that the Hilton confession could not be a part of a continuing coercive process must follow by necessity.

Another reason for finding a second confession tainted by a previous illegally obtained confession is that, in Mr. Justice Harlan's words, the later confession might have been directly produced by the existence of the earlier confession, that is, that it was "* * * merely the product of

the erroneous impression that the cat was already out of the bag." *Darwin* v. *Connecticut, supra,* at 351, 88 S.Ct. at 1491, 20 L.Ed.2d at 635. The defendant's contention is that when the Pawtucket confessions were illegally obtained for failure to give the *Escobedo* warnings, the cat was out of the bag, and his subsequent confession to Hilton could not be considered voluntary because in his mind, having confessed once, he had nothing to lose by confessing again. Mr. Justice Jackson espoused the best explanation of the "cat-out-of-the-bag" theory in *United States* v. *Bayer, supra,* at 540-41, 67 S.Ct. at 1398, 91 L. Ed. at 1660: "Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed."

Thus, if the conditions which made the Pawtucket confessions inadmissible have been removed, the Hilton confession is admissible. As we have stated, our first opinion held the Pawtucket confessions inadmissible because of the failure to give defendant his *Escobedo* warnings. Where no warnings have been given prior to a first confession but subsequently warnings were given prior to the second confession, the later confession has been held not to be tainted by the first. The philosophy of such cases is summed up as follows:

> "It is true that where a confession is secured by actual physical or psychological coercion, the intimidation or fear caused by this coercion may continue to lurk in the defendant's mind and destroy the validity of a

later confession. *Leyra* v. *Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); *Lyons* v. *Oklahoma,* 322 U.S. 596, 64 S. Ct. 1208, 88 L.Ed. 1481 (1944). In such cases, the later confession may well become the 'fruit of the poisonous tree.' See *Nardone* v. *United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426 (1920). However, the Courts have refused to extend this doctrine to cases wherein the defendant has confessed twice, once before and once after he had been advised of his rights. *United States* v. *Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); *Goldsmith* v. *United States,* 107 U.S.App.D.C. 305, 277 F.2d 335 (1960), cert. denied, 364 U.S. 863, 81 S.Ct. 106, 5 L.Ed. 2d 86 (1960); *Castle* v. *United States,* 287 F.2d 657, 662 (5 Cir. 1961), reversed on other grounds, 368 U.S. 13, 82 S.Ct. 123, 7 L.Ed.2d 75 (1961). A confession is not rendered inadmissible solely because an earlier one was made without the defendant first being advised of his rights. The failure to inform him of his right to counsel is not irremediable; and once forewarned and cognizant of his rights, he has only his conscience with which he must contend." *United States* v. *Hickey,* 247 F.Supp. 621, 624-25 (E.D. Pa. 1965).

These cases, though not completely analogous with the case at hand, support the proposition that a failure to warn a defendant of his constitutional rights prior to one confession does not automatically render fatal subsequent admissions even though the cat is out of the bag. In the circumstances of this case, it is true that defendant never received any warnings prior to the confession to Hilton. However, we have concluded that such warnings were not necessary because he was not under interrogation. The defendant spontaneously and voluntarily made his statements to Hilton before any questions were asked. Moreover, the lack of interrogation for more than five hours and the transfer of custody from the Pawtucket police to Captain Hilton constituted a break from what occurred at

the time the Pawtucket confessions took place. Under these circumstances the cat-out-of-the-bag rationale is too tenuous a basis upon which to establish a taint between the initial confessions in Pawtucket and the subsequent confession to Hilton.

Since neither a pattern of coercion nor the mere existence of the Pawtucket confessions produced the Hilton confession, we conclude that defendant failed to establish the existence of a poisoned tree which could have tainted his statements. This conclusion, coupled with our finding that Hilton owed no warnings to defendant, necessitates our holding that the Hilton confession was properly admitted into evidence.

The question remains whether defendant's constitutional rights were violated by admitting into evidence statements he had made while awaiting a hearing in the Family Court on the morning of January 28. At that time he was sitting at a table in the Family Court and was clearly in the custody of the East Providence police, awaiting the opening of court. According to the testimony of several witnesses who were present, defendant, apparently responding to questions directed to him by his mother, admitted again that he had killed the Frenier girl. The testimony of Captain Hilton was that defendant's mother had said: "Tommy, you couldn't have killed, you couldn't have killed that girl in East Providence." The defendant replied: "I did, I did." Hilton stated that defendant got up on his feet and hit the table and said: "Mother, mother, I did, I did." She then said: "Tommy, you couldn't have. You were home in bed." The defendant said: "I left the house and I killed her, I killed her. I did, I did." The trial justice found that these statements were completely spontaneous and voluntary.

The defendant asserts, as he did with the Hilton confession, that these statements were inadmissible, first, be-

cause he received no *Escobedo* warnings, and, secondly, because these statements were tainted by the earlier confessions. Again, we must reject defendant's contentions.

It seems obvious that in the Family Court room defendant was owed no warnings of the *Escobedo* mandate primarily because he was not under interrogation. It is true that he was in custody, but his statements were not made in response to any inquiry by his custodians. The defendant relies primarily on *Commonwealth* v. *Bordner,* 432 Pa. 405, 247 A.2d 612 (1968). In that case the court held that certain incriminating statements by the defendant to his mother and father were inadmissible because no warnings had been given. However, on the facts of the situation the court found that the parents were acting in co-operation with the police and were actually agents of the police and that the defendant, therefore, was entitled to the warnings before he answered his parents' questions. There is no evidence in this case that defendant's mother was acting on behalf of the police.

In fact, as to this issue, this case closely resembles that of *Soolook* v. *State,* 447 P.2d 55 (Alas. 1968). There, the defendant confessed to committing a murder to police officers in his own home without receiving his complete constitutional warnings. The police placed him under arrest, and while he was being escorted from the house, he told his parents that he murdered a girl. The court admitted this confession into evidence because it was not the product of custodial interrogation but was given freely and voluntarily. We reject defendant's contention that the Family Court statements are tainted by the alleged illegality of the previous confessions in Pawtucket for the same reasons we rejected the argument that the confession to Hilton was so tainted. These statements by defendant to his mother were properly admitted into evidence.

Finally, defendant has raised questions as to whether he

was mentally competent on the morning of January 27 and the morning of January 28 to volunteer statements confessing to charges brought against him. The defendant vigorously presses the contention that the trial justice overlooked or misconceived the evidence given by certain witnesses which contradicted the testimony of a doctor on this issue. Apparently, the prison warden and a nurse had made statements which directly contradicted the testimony of Dr. Myers concerning the mental capacity of defendant to waive certain constitutional rights. After listening to the testimony and commenting on the fact that there was no doubt in his mind that defendant was suffering from a personality disorder, the trial justice went on to say that he placed great credence in the soundness of the opinion given by Dr. Myers as to the mental condition of defendant. He concluded: "I am satisfied that the defendant was not suffering from any mental disease which would impair him from making a complete and voluntary free-will confession."

In our opinion, the trial justice's analysis of the merit of the arguments of the defendant concerning his mental condition disposes of the contention. The trial justice said: "Defendant in his testimony before this Court was walking a tightrope. On one hand, he was trying to convince this Court that the police action at Pawtucket Police Headquarters was so outrageous that the Court would have to conclude that his confessions were coerced, and so, he remembers events in great detail—describing rooms that he was in, the furniture, the clothes he was wearing; and then, suddenly, he loses his memory and says he can't remember anything. He can't remember Roy. He can't remember going to the State Police Headquarters and making that statement to Hilton. That is because he is also trying to convince the Court that he was not of a mental state conducive to giving voluntary confessions. Well, as

is happens so very often when someone is walking a tightrope, that person falls and misses on both counts."

The exceptions of the defendant are overruled.

Mr. Justice Powers participated in the decision but retired prior to its announcement. Mr. Justice Doris did not participate.

Mr. Justice Kelleher, with whom Mr. Justice Paolino joins, concurring. We have held that initially the admissibility of alleged tainted evidence is a matter for the trial court and that such evidence should only be admitted if the trial justice has been satisfied by clear and convincing evidence[1] that the proffered evidence was not illegally obtained. *State* v. *Espinosa,* 109 R.I. 221, 283 A.2d 465 (1971); *State* v. *Leavitt,* 103 R.I. 273, 237 A.2d 309 (1968). We also observed in *Leavitt*[2] that in reviewing the trial justice's decision, we must view the evidence in a light most favorable to the prosecution and disturb his findings only if they are clearly wrong. The rule we adopted was based upon our recognition that each case must stand or fall on its facts and the trial court's appraisal of the witnesses' credibility. *State* v. *Leavitt, supra.*

Admittedly, the trial justice did say that Knott, during the five-hour hiatus between the termination of his initial

---

[1]The Supreme Court has recently held that the voluntariness of an in-custody inculpatory statement can be resolved on the basis of a preponderance of the evidence rather than a stricter standard of proof such as "clear and convincing evidence" or "beyond a reasonable doubt." *Lego* v. *Twomey,* 404 U. S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

[2]In *Leavitt,* we affirmed the trial justice's finding that the defendant, while being questioned at Providence Police Headquarters, had freely consented to a search of his automobile. The search took place in the police garage. Leavitt subsequently sought postconviction relief in the Federal Courts. The District Court ruled the search illegal. The Circuit Court reversed the District Court's finding on the basis that the Federal Court is bound by the state's factual findings "unless the petitioner offers convincing evidence that they are erroneous." *Leavitt* v. *Howard,* 462 F.2d 992, 995 (1st Cir. 1972).

investigation and Captain Hilton's appearance, was in a sort of "catatonic trance." However, the trial justice then went on to say that this behavior "was a device to shut off further questioning" and that Knott "knew what was going on during that five-hour period." It is obvious from his comments that the trial justice believed that Knott's "catatonics" was nothing more than an act or a sham.

Knott's statements were voluntary in all respects but inadmissible only because of the rule of *Escobedo*. The trial justice found that the Pawtucket Police did not subject Knott to any psychological or physical abuse prior to placing him in the custody of Captain Hilton. He concluded that whatever taint arose from the failure of the police to give the *Escobedo* warnings had been dissipated at the time Knott asked to talk to Captain Hilton.

A trial justice in the circumstances under review has an advantage which is not enjoyed by an appellate court. He sees and hears the witnesses.

In the light of the trial justice's adverse comments on Knott's supposed trance, I cannot now say that as a matter of law the taint had not been removed when he bared his soul to Captain Hilton in the Scituate Barracks, nor can I say that the trial justice's ruling as to spontaneity was clearly wrong.

Mr. Justice Joslin, dissenting. I would reverse Knott's conviction because in my judgment his confession to Captain Hilton was constitutionally inadmissible.

My starting point is the confessions obtained from Knott at the Pawtucket police headquarters.[1] I agree with the

---

[1]Knott was aged 17 years and 8 months when he made those confessions. While the trial justice here found that at that time he "was not suffering from any mental disease which would impair him from making a complete and voluntary free-will confession" it should not go unnoticed that in 1963, about a month and a half after those confessions were obtained, a Superior Court justice found Knott mentally incompetent to make a rational defense to the Frenier murder. Neither should it go unnoticed

Chief Justice that .those confessions were not the .product of either physical or psychological coercion in the traditional sense. Nonetheless, they were neither voluntary nor the confessor's "free choice," because the "compulsion inherent in the custodial surroundings" of the Pawtucket police headquarters had not been dispelled by an adequate and appropriate threshold warning to Knott that he had a right to counsel and an absolute constitutional right to remain silent. *Escobedo* v. *Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), as explicated in *Miranda* v. *Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Whether the Pawtucket confessions were illegal because of physical or psychological coercion or by reason of some other kind of compulsion is of apparent concern to the Chief Justice. It is not to me for *Miranda* teaches that "compulsion" in the constitutional sense does not demand "overt physical coercion or patent psychological ploys"; the environment of an incommunicado custodial interrogation will suffice. *Miranda* v. *Arizona, supra* at 457, 86 S.Ct. at 1619, 16 L.Ed.2d at 713-14. While such an atmosphere may not have been considered physically intimidating prior to *Escobedo* and *Miranda*, it now "carries its own badge of intimidation," and "is equally destructive of human dignity." *Miranda* v. *Arizona, supra* at 457, 86 S.Ct. at 1619, 16 L.Ed.2d at 714. Moreover, the taint produced by the "compulsion inherent in custodial surroundings" is no less contagious than that generated by physical or psychological coercion. *Westover* v. *United States*, 384 U. S. 436, 494-97, 86 S.Ct. 1602, 1638-39, 16

that he was thereafter confined at the criminal insane ward at the Adult Correctional Institutions until almost three years later when it was determined that he had sufficiently recovered from his mental illness to enable him to stand trial. *See Knott* v. *Langlois*, 102 R. I. 517, 519-20, 231 A.2d 767, 768 (1967).

L.Ed.2d 694, 735-36 (1966), one of the companion cases to *Miranda*.[2]

Once it is accepted that the illegality of the Pawtucket confessions can be infectious, the legal issue becomes whether Knott's subsequent confession to Captain Hilton was tainted by those which preceded. The procedures for seeking the answer to that question are clear and settled.[3] They call first for a careful and wide-ranging inquiry into all the attendant circumstances, *Blackburn* v. *Alabama*, 361 U. S. 199, 206, 80 S.Ct. 274, 279-80, 4 L.Ed.2d 242, 247-48 (1960); then for a determination generally of whether "compulsion, of whatever nature or however infused, propel[led] or help[ed] to propel" the Hilton confession, *Culombe* v. *Connecticut*, 367 U. S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1058 (1961) (Opinion of Mr. Justice Frankfurter); and particularly "for a determination" or "for the establishing" of whether that confession was sufficiently removed in time, place and atmosphere from the compulsion responsible for the Pawtucket confessions to immunize it from the taint of the others. *Westover* v. *United States, supra*.

On the basis of the facts found by the trial justice, supplemented by the uncontradicted evidence, the following can be taken as the significant circumstances. Shortly after the Pawtucket confessions were obtained, Knott, while still held incommunicado in an interrogation room at the Pawtucket police headquarters, went into a "sort

[2]In *Westover* v. *United States*, 384 U. S. 436, 494-97, 86 S.Ct. 1602, 1638-39, 16 L.Ed.2d 694, 735-36 (1966), even adequate warnings given by FBI agents at the outset of their interrogation did not insulate the confession they obtained from the primary taint of a prior confession secured by local officials without similar warnings.

[3]I approach that question uninfluenced, just as I know my brethren are unaffected, by any considerations concerning the truth or falsity of Knott's confessions, or his guilt or innocence of the atrocious crime which was committed.

of catatonic trance" from which he did not emerge until about 5 o'clock the next morning.

About three quarters of an hour later he was turned over to Captain Hilton of the East Providence Police Department.[4] During the previous night he had been in and out of the Pawtucket police headquarters and knew that Knott had already incriminated himself.

For reasons not here material, Captain Hilton decided to leave Pawtucket and to continue the investigation and further interrogation of Knott at the Scituate State Police Barracks. Accordingly, he, together with two other police officers and Knott, drove there in a state police vehicle. The trip took about half an hour, and en route Knott was handcuffed to a police officer. Upon arrival at the barracks Captain Hilton took Knott to an office, uncuffed him and asked him to sit down. At that moment, and without further ado, Knott stated, "I'd like to speak to you alone." Captain Hilton requested the other police officer then in the room to leave. During the next twenty to thirty minutes Knott, without prompting or interruption from Captain Hilton, confessed in detail to the Frenier killing.

At no time during the interval which started with his original apprehension and terminated with the "volunteered" statement to Captain Hilton was Knott informed of his *Escobedo* rights, offered an attorney, advised of his absolute constitutional right to remain silent or, at any time after his arrival at the Pawtucket police headquarters, allowed to speak to his parents. During the entire interval he was continuously in the presence of at least one and sometimes as many as four police officers, and

---

[4] Captain Hilton had been in charge of the investigation of the Frenier murder from its beginning. He had twice previously taken Knott, a prime suspect in the case from its inception, into custody and questioned him without warning him of his rights.

when he confessed to Captain Hilton had neither eaten nor slept since his apprehension at 10:30 on the previous night.

Moreover, by the time he "volunteered" to tell all to Captain Hilton, Knott had already "let the cat-out-of-the-bag" by confessing to the Pawtucket police.

That his "secret [was] out for good" and that he would never thereafter be "free of the psychological and practical disadvantages of having confessed" does not mean that the illegality which produced his earlier confessions should in all events be regarded either as having induced an otherwise proper later confession or as having perpetually disabled him "from making a usable [confession]."

*United States* v. *Bayer,* 331 U. S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), adopts neither of these extreme positions. Instead, after examining all the circumstances, the Court there decided that the taint of the prior illegal confession[5] had been dissipated in the six-month span which intervened between it and the subsequent otherwise legal confessions, during which interval the only restraint under which the defendant had labored was that he could not leave the base where he was stationed without permission.

*Bayer,* however, is hardly comparable to this case. Here, the interval between the two confessions, instead of being six months, was six or seven hours during which time Knott, unlike the defendant in *Bayer,* continued in intimi-

---

[5]The circumstances were that the defendant army officer was placed under arrest on August 9, 1944, and confined in the psychopathic ward in the station hospital where, for some time, he was denied callers, communications, comforts and facilities. Charges were not promptly served upon him as required by the Articles of War, nor was he brought before a magistrate and arraigned on the charges preferred against him by the civil authorities. These were the restraints to which he was subjected when he confessed on September 5 or 6, 1944. Without going into any of the details, the Court assumed that his confession was inadmissible under *McNabb* v. *United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

dating surroundings equivalent to those which had produced his earlier concededly illegal Pawtucket confessions.

In my judgment, therefore, "the psychological and practical disadvantages [to Knott] of having confessed" is a significant factor. While in and of itself not compelling, it nonetheless belongs in the hopper together with all other relevant circumstances.

In any event, cat-out-of-the-bag or no, a realistic appraisal of those circumstances in this case satisfies me that the Pawtucket confessions propelled or helped to propel the later "volunteered" Hilton confession, *Culombe* v. *Connecticut, supra* at 602, 81 S.Ct. at 1879, 6 L.Ed.2d at 1058; that Captain Hilton was a beneficiary of the corrosive influences of the place and atmosphere which produced the Pawtucket confessions, *Westover* v. *United States, supra;* and that the "stream of events" which started with Knott's apprehension at 10:30 on the night of January 26, and continued throughout the confession "volunteered" to Captain Hilton was not broken by any event "sufficient to insulate" that confession "from the effect of all that went before." *Clewis* v. *Texas*, 386 U. S. 707, 710, 87 S.Ct. 1338, 1340, 18 L.Ed.2d 423, 427 (1967); *Darwin* v. *Connecticut*, 391 U. S. 346, 349, 88 S.Ct. 1488, 1489-90, 20 L.Ed.2d 630, 633-34 (1968).

In his opinion, the Chief Justice, however, says that "* * * the lack of interrogation for more than five hours and the transfer of custody from the Pawtucket police to Captain Hilton constituted a break from what occurred at the time the Pawtucket confessions took place," and that defendant has "* * * failed to establish the existence of a poisoned tree which could have tainted his statements." I do not agree.

The Chief Justice fails to support that proposition with the citation of any authority, and he completely ignores the conditions which prevailed when Knott emerged from

his five-hour "sort of catatonic trance"[6] and was about to be turned over to Captain Hilton. Those conditions had not changed significantly from what they were when he entered that trance. He was still in the same room, still guarded by one or more police officers, still without advice from parents or counsel, still denied access to the outside world, and still subject to the intimidating influence of custodial surroundings. The only change was that five hours had elapsed.

It was as if he had been on the rack, confessed, lapsed into unconsciousness, emerged five hours later still on the rack, and then turned over to Captain Hilton to whom he "spontaneously" told all. Can there be any doubt that a confession in those circumstances would be rejected?

"Although the process of decision in this area, as in most, requires more than a mere color-matching of cases * * *" *Reck* v. *Pate*, 367 U. S. 433, 442, 81 S.Ct. 1541, 1547, 6 L.Ed.2d 948, 954 (1961), the extreme position the Chief Justice takes invites comparison.

A sampling of the authorities evidences that neither transfer of an accused from the custody of one police department to that of another, his removal from one place of detention to another, nor lapse of time will without more purge an otherwise admissible confession of the taint of an earlier confession obtained in violation of *Escobedo-Miranda* mandates.

---

[6]While I have borrowed the trial justice's description of Knott's state during the five-hour interval as being a "sort of catatonic trance," I also accept as a premise for whatever else I have to say, the trial justice's finding that Knott used that "trance" as a device to shut off any further questioning on the subject of the murders. What is decisive in this case is not whether Knott was in a trance or a pretended trance during that interval, but whether the Hilton confession was sufficiently removed in time, place and atmosphere from the compulsion responsible for the Pawtucket confessions to insulate it from their corrosive influences.

Thus, for example, a subsequent confession, irrespective of whether "spontaneous" or preceded by adequate warnings, was held inadmissible: in *Westover* v. *United States, supra* at 496-97, 86 S.Ct. at 1639, 16 L.Ed.2d at 736, where notwithstanding a transfer of custody the court held that the FBI agents who obtained the later confession were the "beneficiaries of the pressure applied" by the local officials who secured the earlier one; in *Evans* v. *United States,* 375 F.2d 355 (8th Cir. 1967), where there was a lapse of three days between the time an accused confessed to a local officer at a police station and when, in the presence of the same local officer, he confessed to an FBI agent at the city jail, and the court found that the "difference" in place was "not meaningful," and that the accused "* * * was on both occasions a prisoner and the atmosphere on April 11th was no different than it was on April 8th." *Id.* at 360, n.4; in *State* v. *Lekas,* 201 Kan. 579, 442 P.2d 11 (1968), where approximately one hour after being taken into custody and confessing to a parole officer the accused confessed to a sheriff; in *Commonwealth* v. *Eperjesi,* 423 Pa. 455, 224 A.2d 216 (1966), where an earlier confession made to a state police officer in the office of a justice of the peace was followed two days later by one made to the same officer who, together with a detective, questioned the defendant at the county jail; in *Dean* v. *Commonwealth,* 209 Va. 666, 166 S.E.2d 228 (1969), where the later confession was made "shortly after" the earlier one; in *Brunson* v. *State,* 264 So.2d 817 (Miss. 1972), where the defendant confessed to a police officer sometime in the morning and to the city attorney at about one o'clock in the afternoon of the same day; and in *Cagle* v. *State,* 45 Ala. App. 3, 221 So.2d 119 (1969), *cert. denied* 284 Ala. 727, 221 So.2d 121 (1969), where the defendant confessed at a police station, was removed to a hospital where he was anesthetized and a forehead wound treated and stitched.

and then taken into a "prayer room" in the hospital where he again confessed.

In each of the foregoing cases, as in this case, the "compulsion inherent in custodial surroundings" continued from original arrest to final confession, and whatever breaks there may have been in the "stream of events" — even though in most instances sharper than those relied upon by the Chief Justice's opinion here — were "insufficient to insulate" the later confession "from the effect of all that went before," or to remove it from the time, place and atmosphere of what preceded.

My brother, Kelleher, in his concurring opinion, says that all testimonial conflicts with respect to the admission of the Hilton confession were settled by the trial justice's judgment, and that his findings of fact, unless clearly wrong, become the basis for our review. I agree. That principle, as my brother points out, stems from the advantage which an opportunity to see and hear witnesses gives a trial justice when he passes on credibility. That vantage is of no assistance in the determination of a legal as distinguished from a factual question. Yet my brother Kelleher uses it as a base for applying the same clearly wrong rule to the trial justice's legal conclusion that the taint of Knott's illegal Pawtucket confession was dissipated by the time of the Hilton confession. With that I cannot agree. To extend the same degree of finality to a legal determination as we do to fact-finding is to ignore the distinction "* * * between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this Court sits." *Watts* v. *Indiana*, 338 U. S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801, 1804 (1949) (Opinion of Frankfurter, J.) The distinction between the two becomes particularly apt in a due process case where the judicial task is to relate uncontested facts to a rule of law

formulated by the Supreme Court. That is a legal, not a fact-finding, procedure. It cannot be left to the trial justice's determination, and the ultimate responsibility to see to its proper execution rests with a reviewing court regardless of how it may have been resolved by the trier of the facts. *Culombe* v. *Connecticut, supra* at 603-06, 81 S.Ct. at 1879-81, 6 L.Ed.2d at 1037, 1058-60. For examples of this principle in action in taint cases we need not go outside of this dissent. *Darwin* v. *Connecticut; Clewis* v. *Texas; Westover* v. *United States; United States* v. *Bayer,* all *supra.*

In my judgment the unconstitutional Pawtucket confessions tainted the later "spontaneous" Hilton statement and Knott's conviction should therefore be reversed. In these circumstances I do not reach the question of the admissibility of the incriminating statements made by Knott in Family Court on the morning of January 28, 1963.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Asst. Attorney General, for plaintiff.

*Thomas Richard Knott, Jr.,* pro se.

*Leonard Decof* (court-appointed attorney for the limited purpose of protecting rights of defendant during prosecution of his appeal), for defendant.