405 A.2d 1192.

STATE *vs.* ROBERT CLINE.

AUGUST 31, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

WEISBERGER, J. On April 11, 1974, Frank Pirri, an itinerant fish vendor, was shot and killed while peddling fish from his truck in the Chad Brown Housing Project in Providence. It was believed that the assailant shot Mr. Pirri in the course of attempting to rob him. As a result of information obtained from an eyewitness, the defendant, Robert Cline (Cline), was arrested in the early morning of April 14, 1974. The day was Easter Sunday.

The defendant was transported to the Providence police station. After the arrival of Detective Sergeant Gerald J. McCarthy, defendant was brought to an interrogation room where, according to police testimony, he was informed of his Miranda rights by having them read to him from a so-called "rights form." Further, he was assertedly given a supplemental explanation by Det. Sgt. McCarthy. At this point defendant asked to make a phone call, but then changed his mind, according to state's witnesses. The defendant claimed to have made several phone calls. Then defendant signed the waiver-of-rights form,[1] and indicated

---

[1]The full text of the rights form was as follows:

*"PROVIDENCE POLICE DETECTIVE BUREAU*

| | |
|---|---|
| Time *3:40 A.M.* | Statement taken by _____ |
| Date *4/14/74* | *Sgt. McCarthy, Det. Keune Present* |
| *Office of Det. Div.* | *Providence Police Department* |

I, *Robert Cline*, having been informed that I am a suspect in the crime of Murder voluntarily, without threats or promises on the part of the police, make the following statement to members of the Providence Police Department after having first been advised that:

1. I do not have to give a statement.
2. I have the right to remain silent.
3. Anything I say can be used against me in a court of law.
4. I have the right to the presence of an attorney prior to and during any questioning by the police.
5. I have the right to the presence of an attorney during a line-up or confrontation of witnesses, if any line-up or such confrontation takes place.
6. If I cannot afford an attorney, one will be appointed for me prior to any questioning, if I so desire.

I further admit and agree that:

7. After having been informed of my constitutional rights, I do understand these rights, and I agree to give a statement at this time.
8. I do not want an attorney called or appointed for me at this time.

WITNESSES: *Sgt. McCarthy*                                   *Robert Cline*
                          *Det. T. E. Keune*                                   signature

his willingness to talk to the police. Thereafter he gave and signed a partial confession, admitting that he shot the victim in the course of a holdup. The defendant interrupted the flow of his statement about 45 minutes after the police had admonished him regarding his constitutional rights. At this juncture, for the first time, defendant expressed a desire to be represented by counsel.

The interrogation ceased. Detective Sgt. McCarthy then contacted attorney Harry J. Hoopis (Hoopis), who had been designated by a justice of the District Court to represent any person who might be arrested as a result of the Pirri investigation. Hoopis came to the station. McCarthy asked the attorney if he would inquire if Cline was willing to show the police the location of the gun. Hoopis and defendant, after consultation, agreed to and did accompany the police to the Point Street Bridge where Cline had stated that he disposed of the murder weapon. Thereafter, a lineup was held in the presence of Hoopis.

The case was tried in the Superior Court after extensive preliminary hearings on motions to suppress and voir dire examinations of the prospective jurors. The actual trial began April 16, 1975, and resulted in a verdict of guilty of murder in the first degree while defendant was committed to confinement at the Adult Correctional Institutions (ACI). The defendant was also found guilty of escape from the minimum custodial unit of the ACI. These verdicts were rendered April 30, 1975. The defendant moved for a new trial. The motion was denied May 21, 1975. On that same date defendant was sentenced to death, and said sentence was stayed pending appeal. The defendant appealed from his murder conviction and also from the death sentence, alleging numerous errors.

This court subsequently reviewed the constitutionality of G.L. 1956 (1969 Renactment) §11-23-2, as amended by P.L. 1973, ch. 280, §1, the capital punishment statute, pursuant to which the death sentence had been imposed. We held in State v. Cline, 121 R.I. 299, 397 A.2d 1309 (1979), that the capital penalty portion of said statute

was unconstitutional in that it provided for a mandatory death sentence without taking into account the individual background and record of the accused or any mitigating circumstances which the accused might present in violation of criteria laid down by the Supreme Court of the United States in *Bell* v. *Ohio*, 438 U.S. 637, 98 S. Ct. 2977, 57 L. Ed. 2d 1010 (1978); *Lockett* v. *Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Roberts* v. *Louisiana*, 431 U.S. 633, 97 S. Ct. 1993, 52 L. Ed. 2d 637 (1977); *Roberts* v. *Louisiana*, 428 U.S. 325, 96 S. Ct. 3001, 49 L. Ed. 2d 974 (1976); *Woodson* v. *North Carolina*, 428 U.S. 280, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976). The defendant was resentenced on March 2, 1979, this time to life imprisonment, on the conviction of first-degree murder and was sentenced the same date to a term of 3 years imprisonment for escape from the ACI.

The case is now before us on the merits of defendant's appeal from his murder conviction. We shall refer in the course of this opinion to more detailed facts as these facts are relevant to the issues raised by defendant.

I

## THE DENIAL OF DEFENDANT'S MOTION TO SUPPRESS HIS CONFESSION

Prior to trial, defendant moved to suppress the confession taken at the Providence police station on the ground that it was involuntary and had been obtained by the use of physical force and coercion. The defendant also alleged that the confession was obtained in violation of his constitutional rights, including but not limited to his right to counsel.

A lengthy suppression hearing was held before the trial justice beginning October 2, 1974. This motion was denied on October 17, 1974. Thereafter the suppression hearing was reopened on March 13, 1975, in order to allow defense counsel an opportunity to present Dr. Joseph E. Donahue, the medical officer at the ACI. After hearing the testimony of Dr. Donahue, the trial justice reaffirmed his decision denying the motion to suppress.

The defendant's principal claim in support of his motion to suppress might be summarized by the statement that he was not given his Miranda rights as claimed by the Providence police and that he was kicked, beaten, and otherwise coerced into signing a confession. The trial justice found that defendant's statements were lacking in credibility. He found that his testimony posed a number of inherent improbabilities, contained numerous contradictions, and in many instances his testimony was negated by persuasive and unimpeached documentary evidence. Although this court exercises its independent judgment in determining whether constitutional rights have been appropriately applied, *Ker* v. *California*, 374 U.S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963); *State* v. *Smith*, 121 R.I. 138, 396 A.2d 110 (1979), we do not sit as a court of *nisi prius*, and deference must be given to the findings of fact made by the trial justice. Indeed, our rule has been that findings of fact on motions to suppress will not be overturned unless such findings are clearly erroneous. *State* v. *Leavitt*, 103 R.I. 273, 237 A.2d 309 (1968). We defined "clearly erroneous" in terms which had been established in *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 68 S. Ct. 525, 92 L. Ed. 746 (1948):

> " ' "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." ' " 103 R.I. at 290, 237 A.2d at 318.

This rule has been applied in a number of federal cases in which the question of waiver or consent was the issue on motions to suppress. *United States* v. *Greer*, 566 F.2d 472 (5th Cir.), *cert. denied*, 435 U.S. 1009, 98 S. Ct. 1881, 56 L. Ed. 2d 391 (1978) (confession); *United States* v. *Brown*, 557 F.2d 541 (6th Cir. 1977) (confession); *United States* v. *Page*, 302 F.2d 81 (9th Cir. 1962) (consent to search). This rule is consonant with the profound analysis given by Mr. Justice Frankfurter concerning the establishment of historical facts as a basis for determining voluntariness of a confession in *Culombe* v. *Connecticut*, 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). The following language from the opinion is instructive:

> "Determination of what happened requires assessments of the relative credibility of witnesses whose stories, in cases involving claims of coercion, are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom those witnesses actually appear, subject to whatever corrective powers a State's appellate processes afford.

> "This means that all testimonial conflict is settled by the judgment of the state courts. Where they have made explicit findings of fact, those findings conclude us and form the basis of our review—with the one *caveat*, necessarily, that we are not to be bound by findings wholly lacking support in evidence. See *Thompson* v. *Louisville*, 362 U.S. 199." *Id.* at 603, 81 S. Ct. at 1879, 6 L. Ed. 2d at 1058.

Applying the "clearly erroneous" standard to the facts elicited at the suppression hearing, we note that the trial justice was faced with contradictory testimony. Several police officers testified that no force or coercion was used, that defendant was advised of his Miranda rights as set forth on the so-called "rights form" which was admitted as State's Exhibit 1, that he was advised of his right to counsel and that he declined counsel at first, after changing his mind about making a telephone call. The officers further testified that after giving a partial statement in the form of a confession as recorded in State's Trial Exhibit 32 (also part of State's Suppression Hearing Exhibit 1), defendant expressed a desire to be advised by a lawyer. At that point the officers stated that the interrogation ceased and attorney Harry Hoopis was contacted in accordance with a prearranged designation.

In the face of this testimony, defendant stated that he was beaten, that his hands were stepped upon, that he was kicked and struck with various blunt instruments. The defendant admitted that his signature was on the rights form, but claimed that he signed it only as a result of fear and coercion. He categorically denied that any Miranda rights were set forth to him by the police then or at any time in the past. In

his decision the trial justice pointed out a number of contra-dictions and inconsistencies in defendant's testimony on this subject. Indeed, defendant at one point contradicted his corroborative witness, Melvin Spivey, in regard to whether he had been beaten in the cell block area. The trial justice pointed out the defendant had not complained to a physician who examined him 2 days after his interrogation that he had been beaten. Perhaps the most persuasive uncontradicted fact perceived by the trial justice was the willingness of defendant to accompany the police to the Point Street Bridge to seek to locate the murder weapon after defendant had consulted with attorney Hoopis.

The trial justice felt that this conduct was not consistent with the behavior to be expected from a person who had been coerced by physical force into signing a confession. The trial justice also pointed out the testimony of another impartial witness, Reverend August J. Delvaux, the Providence Police Department Chaplain, whose account of events surrounding defendant's being placed in the police cruiser differed from that of defendant in many material respects. Notably, Father Delvaux's observations did not include the incident of stepping on defendant's hands or any other violence in placing defendant in the police car as Cline recounted.

Probably the most persuasive evidence introduced by defendant in support of his claim of brutality was the testi-mony of Dr. Joseph E. Donahue which was presented on the reopening of the suppression hearing on March 13, 1975. Doctor Donahue testified that he examined Mr. Cline upon his admission to the ACI on April 16, 1974 (2 days after the interrogation). Doctor Donahue noted multiple contusions of the left chest, left arm and both legs of defendant on this occasion. In the course of this examination no complaints were made by defendant as to the origin of these contusions. Also, Dr. Donahue did not note any cuts or abrasions on the hands of defendant. These contusions, in the doctor's opinion, might have ranged between 2 and 5 days "in dura-tion from the time of their origin." Previously the court had

heard testimony from Dr. James F. Brown who had examined defendant on May 16, 1974. During the course of this examination at Rhode Island Hospital in the Multiphase Screening Center, scars on both hands were noted. For the first time, during this examination, Cline had complained to the doctor that he had been struck on the lower legs with a heavy stick, such as a billyclub, struck over the shoulders with a heavy, soft object such as a sandbag, and that persons had stepped on his hands. It should be noted that Dr. Donahue on April 16, 1974, had not noted any contusions or marks in the shoulder area. On the basis of this testimony, the trial justice found as a fact that no beatings had taken place prior to the interrogation or in the course of the interrogation by the members of the Providence police. He determined that the bruises and scars noted by Dr. Donahue and Dr. Brown had not been tied in to the interrogation and in all probability could have resulted from activities of defendant entirely unrelated to this interrogation or his arrest. In sum, he found defendant's testimony wholly lacking in credibility and the corroborative evidence of bruises was simply not linked in any persuasive way with actions by the police. On the totality of all of the evidence, we cannot say that the trial justice's findings of fact were clearly erroneous in the light of the testimony taken at the suppression hearing. He resolved contradictory testimony of various witnesses, applying standards of credibility thereto. We cannot fault his determination of these historic facts.

The defendant further argues on the issue of voluntariness that he had ingested intoxicants in the form of alcoholic beverages, topped off by the smoking of marijuana and, therefore, was incapable of voluntary waiver of his Miranda rights. The trial justice rejected this claim in specific terms when he found the confession was voluntary. Here again, the trial justice's finding was rather substantially buttressed by the testimony of defendant himself, who said that he was mellow but knew everything that was going on. Thus, defendant never achieved the threshold factual plateau upon which the question of his capacity for voluntariness would be

placed in issue, in the absence of a positive assertion that defendant's will had been overborne by voluntary ingestion of intoxicants. Several police witnesses testified that defendant was in full possession of his faculties, although one police officer indicated that defendant seemed high to him because of his unusual calmness. On this state of the evidence, the trial justice was not clearly wrong in his finding of voluntariness on this issue.

The defendant also challenges certain of the trial justice's evidentiary rulings on the ground that the latter excluded some testimony which might have furnished circumstantial evidence of intoxication by showing materials found in the course of the search of the cab in which defendant was arrested. In the light of defendant's own testimony on this issue, a foundation of relevancy was clearly not established and, therefore, these rulings did not constitute error, prejudicial or otherwise.

The defendant contends that the Providence police who interrogated him did so in violation of his right to counsel. This claim is predicated upon the argument that attorney Hoopis had been appointed to represent Cline and that the relationship of attorney and client existed between Hoopis and Cline prior to the time of defendant's interrogation by the Providence police. He then asserts that principles set forth in *Massiah* v. *United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1946), as further applied in *Brewer* v. *Williams*, 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977), would prevent any waiver on the part of Cline, even if voluntary, unless counsel was present for consultation.

The evidence in this case if viewed without torturing the reasonable meaning of the witnesses' statements shows beyond doubt that the relationship of attorney and client did not exist between Hoopis and defendant until defendant and Hoopis met at the police station after the interrogation had taken place. Hoopis stated on direct examination in the suppression hearing:

"Q Did you have occasion to be appointed indigent counsel of one Robert Cline?

"A Yes.

"Q And do you remember the day?

"A I know it was the Friday before Easter of 1974, which would have probably been the 12th. April 12th I received a phone call from Judge Orme's office, first on one case that I went down to the police station; then I received a subsequent call stating that they expected another arrest over the weekend and if I would be on call over the weekend to represent anyone who may be interested concerning certain crimes.

"Q Now, Easter Sunday, April 14th, were you so called?

"A I was.

"Q And did you go, in response to this call, go to the police station?

"A I did.

"Q And who called you if you can remember?

"A Gerald McCarthy, I believe, called me.

"Q And what time did you arrive at the Providence Police Station on Sunday, April 14th, approximately?

"A Between four and five o'clock in the morning.

* * *

"Q And did you have a conversation with Sgt. McCarthy at this time?

"A Yes, I did.

"Q And what was the nature of that conversation with Sgt. McCarthy?

"A He explained to me that Mr. Cline had been arrested and questioned and then he directed me to Mr. Cline."

From the foregoing testimony it is apparent that the Providence police had arranged through the District Court to have an attorney available in the event that a suspect was arrested over the Easter weekend and made a request for counsel. An examination of Hoopis' entire testimony shows that he had never met Cline prior to being called by Det. Sgt. McCarthy to go to the police station that morning between 4 and 5 a.m. That same morning after consultation with defendant, Hoopis and Cline went to the Point Street Bridge in order to attempt to locate a pistol which had been allegedly disposed of by Cline at that location. Later a lineup was held at which Hoopis was present.

Generally, the relationship of attorney and client arises by reason of agreement between the parties. The relationship is essentially one of principal and agent. *See C.C. Plumb Mixes, Inc.* v. *Stone*, 108 R.I. 75, 272 A.2d 152 (1971); *Coro Federal Credit Union* v. *Cameo Club*, 91 R.I. 131, 161 A.2d 410 (1960). Although the agreeement which creates this relationship need not be a formal contract, a contract at least must be implied by the conduct of the parties. *Lawrence* v. *Tschirgi*, 244 Iowa 386, 57 N.W.2d 46 (1953); *Nicholson* v. *Shockey*, 192 Va. 270, 64 S.E.2d 813 (1951). Usually the relationship is established by a showing that the advice and assistance of the attorney are sought and received in matters pertinent to the attorney's profession. *Nicholson* v. *Shockey, supra.* Obviously, such a relationship could not exist between persons who had never met and who in all probability were unaware of each other's existence prior to the meeting in the Providence police station. The fact that Hoopis was designated by a justice of the District Court to be available to represent a person whom Hoopis did not know—in the event that such person might be arrested for a crime for which more than one suspect might be apprehended—could not create the relationship of attorney and client such as existed under the facts of *Massiah* v. *United States*, or *Brewer* v. *Williams*, both *supra.* In those cases, without question defendants and their attorneys had an unequivocal

relationship prior to the bugging of the automobile in *Massiah* and the "Christian burial speech" in *Brewer*.

Nevertheless, defendant misconceives the effect of *Brewer* when he contends that after appointment of counsel a waiver of Sixth and Fourteenth Amendment rights could not be made. This contention was specifically negated by Mr. Justice Stewart when he stated:

> "The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." *Id*. at 405-06, 97 S. Ct. at 1243, 51 L. Ed. at 441.

Thus, the finding of the trial justice that defendant had waived his right to counsel prior to making statements to the police did not violate under the facts of this case the principles of *Massiah* and *Brewer*. The finding of waiver was abundantly supported by the evidence in the record and was not determined in violation of any constitutional principles. On this record it is not necessary for this court to determine whether it would adopt the rules enunciated by the Court of Appeals of the State of New York in *People* v. *Hobson,* 39 N.Y.2d 479, 348 N.E.2d 894, 384 N.Y.S.2d 419 (1976) and *People* v. *Arthur,* 22 N.Y.2d 325, 239 N.E.2d 537, 292 N.Y.S.2d 663 (1968).

The defendant argues that his confession was not voluntary, by reason of the fact that the police failed to warn him of the severity of punishment which might be imposed for his offense. It is apparent from the record and from the rights form that defendant was told that he was a suspect in a murder case and that his arrest and custody were based upon probable cause to believe that he was the person who had perpetrated the crime of murder. The evidence is conflicting as to whether it was brought to the defendant's attention that he might have been subject to the death penalty in the event of conviction. The short answer to this argument is that the

Supreme Court in furtherance of the Miranda principles has never required the police to give an estimate or admonition concerning probable maximum penalties. In this instance, subsequent judicial holdings have eliminated the death penalty from consideration in this case and, therefore, if the police had admonished or warned defendant concerning the applicability of the death penalty, they would have been warning him of a penalty which constitutionally could never have been imposed. *State* v. *Cline, supra.*

The defendant finally argues that his confession should have been suppressed on the ground that it was obtained in violation of the Code of Professional Responsibility, DR 7-104(A)(1).[2] This contention is without merit in light of our determination that Hoopis did not represent Cline at the time of his interrogation by the Providence police. Hoopis did not represent Cline until Det. Sgt. McCarthy arranged a meeting between the two pursuant to Cline's request during the course of his interrogation that he be given the advice of counsel.

It is therefore unnecessary for us to consider whether this canon is in any way relevant to police interrogation. The canon is directed toward attorneys and is designed to control the activities of members of the bar. Therefore, whether the canon could ever be violated by a police officer who inter-rogates a suspect without any consultation with an attorney-at-law and without any participation by an attorney expressly or by implication is a matter which we would reserve until the question is presented in concrete form.

---

[2]DR 7-104(A)(1) reads as follows:

"DR 7-104. Communicating With One of Adverse Interest.—(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

On all of the foregoing issues, the trial justice found that the state had sustained the burden of proving the confession to be voluntary by clear and convincing evidence.

In our opinion the determination of the Superior Court not to suppress the confession is factually not clearly erroneous and is consonant with the constitutional principles enunciated in *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) and with our own cases, *State* v. *Vargus,* 118 R.I. 113, 373 A.2d 150 (1977); *State* v. *Beaulieu,* 116 R.I. 575, 359 A.2d 689 (1976); *State* v. *Lachapelle,* 112 R.I. 105, 308 A.2d 467 (1973); *see State* v. *Knott,* 111 R.I. 241, 302 A.2d 64 (1973).

## II

### THE ISSUE OF EXCLUSION OF JURORS

The defendant contends that the trial justice's exclusion of eight prospective jurors from service on the jury empanelled to try his case violated the principles laid down in *Witherspoon* v. *Illinois,* 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). At the outset we would do well to examine precisely what the Supreme Court of the United States held in *Witherspoon.* In that case a jury was empanelled to perform two responsibilities. First, it was the task of the jury to determine guilt or innocence; second, it was the function of that jury to impose a penalty which might include a sentence of death. The determination of whether to impose capital punishment would depend upon an exercise of the jurors' discretion. Under an Illinois statute, the trial justice proceeded to excuse 47 veniremen solely on the basis that they had " 'conscientious or religious scruples against the infliction of the death penalty' or against its infliction 'in a proper case.' " The Supreme Court found that 39 veniremen were excluded "without any effort to find out whether their scruples would invariably compel them to vote against capital punishment." *Id.* at 515, 88 S. Ct. at 1773, 20 L. Ed. 2d at 781. The Court limited its holding with the following important observation:

"The issue before us is a narrow one. It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them. For the State of Illinois did not stop there, but authorized the prosecution to exclude as well all who said that they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it." 391 U.S. at 513-14, 88 S. Ct. at 1772-73, 20 L. Ed. 2d at 780.

It might well be argued that since *Witherspoon* specifically held that only the death penalty was unconstitutionally applied, and since the determination of guilt in that case was not disturbed, even though made by a jury from which nearly all of those who indicated objection to the death penalty had been summarily excluded, no constitutional challenge can be made concerning the finding of guilt in the present case.

However, it is unnecessary for us to reach this question, since in the instant case there was no violation by the trial justice of the principles enunciated in *Witherspoon*. An examination of the lengthy voir dire examination of all of the jurors, including those who were excluded, reveals that the trial justice made every effort to determine from the jurors whether, in spite of their opinions regarding the death penalty, they were able to assure the court that they would follow their oaths as jurors and would determine the question of guilt or innocence on the basis of the evidence submitted in the case. The trial justice only sought to elicit assurances from these prospective jurors that they would subordinate their personal views concerning the death penalty to this paramount obligation to determine guilt or innocence based solely upon the evidence presented to them. In our opinion, insofar

as the principles of *Witherspoon* are applicable to the selection of a jury whose sole consideration was guilt or innocence and whose members were not to be concerned with imposition of a penalty, the trial justice's conduct of the interrogation and his rulings on the question of qualification were in complete consonance with those principles.

In the real context of an adversary voir dire, a trial justice cannot perform his function in a vacuum, and, therefore, his is not a theoretical exercise of the application of principles which might be derived from appellate opinions. Frequently the replies of jurors to questions posed by counsel whose objectives are diametrically opposed will require the application of fine judgmental determinations. In this connection the trial justice in this case frequently interrogated jurors in order to resolve ambiguities and clarify equivocal replies to questions of counsel which they might not have understood, and which were not always models of clarity.

In every instance, his determination to exclude a juror who could not give an assurance that he or she would subordinate his or her philosophic disagreement with the death penalty to the performance of his or her duty to determine guilt or innocence in accordance with the evidence was entirely justified.

Therefore, even assuming, without deciding, that the principles of *Witherspoon* are in any way applicable to a jury whose sole function is the determination of guilt or innocence rather than penalty, even in the light of the more recent studies and articles cited by defendant, there is utterly no indication that this jury in the case at bar was in any way lacking in impartiality or indifference so as to deprive defendant of a reasonably impartial jury in accordance with his right under the Sixth and Fourteenth Amendments to the Constitution of the United States or under the parallel provisions of the Rhode Island Constitution.[3]

---

[3]It must be emphasized, in spite of this assumption, that the majority of the Court in *Witherspoon* v. *Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776

In light of our determination, it is unnecessary to consider the possible effect which the selective incorporation of the Sixth Amendment right to jury trial in *Duncan v. Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968), might have had in a theoretical case not presented in this record upon the scope of review of the guilt findings in *Witherspoon*.

## III

### THE IN-TRIAL PUBLICITY ISSUE

The defendant challenges instructions given by the trial justice during the course of trial concerning the obligation of jurors in respect to the reading of and listening to media accounts of the trial. The defendant further argues that on 3 occasions the trial justice declined to poll the jurors in respect to allegedly prejudicial statements in the press.

Although this case was one in which the possibility of imposition of sentence of death was involved, the press and media exercised commendable restraint in purporting to publish during the course of trial only matters which had been presented in court before the jury. Thus, the only allegation presented by defendant of prejudicial publicity in the course of this lengthy trial is an assertion that defendant was referred to in news accounts as "an escapee," and the

(1968), specifically disavowed any holding that a conviction by a jury from which jurors opposed to capital punishment had been excluded was invalid. In response to studies and scientific evidence advanced to show that jurors unopposed to the death penalty are partial to the prosecution on the basis of guilt or innocence, the Court observed:

"The data adduced by the petitioners, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was." *Id.* at 517-18, 88 S. Ct. at 1774-75, 20 L. Ed. 2d at 782.

further assertion that The Providence Journal and Evening Bulletin erroneously reported that the death penalty was mandatory for anyone who committed murder while "serving a sentence of imprisonment." The thrust of the assertions is that defendant was prejudiced by these accounts because a juror might infer therefrom that defendant had committed some prior crime in order to be in prison.

We have recently noted that when a claim is made of exposure by jurors to newspaper articles during the course of a trial, it is necessary to make a showing that defendant was prejudiced thereby. *Palmigiano* v. *State,* 120 R.I. 402, 387 A.2d 1382 (1978). In that case we quoted the general rule as expressed in *United States* v. *Thomas,* 463 F.2d 1061 (7th Cir. 1972):

> " 'Newspaper and television publicity surrounding a trial represent the most common threats to the integrity of the proceedings. This is not to suggest, however, that juror exposure to any publicity vitiates the fairness of the trial. The severity of the threat depends upon both the nature of the information so publicized and the degree of juror exposure to it.' " R.I. at 387 A.2d at 1385.

In *Palmigiano, supra,* we further observed that in cases in which substantial prejudicial publicity has been found to have reached the jury during trial, the publicity has generally involved " 'information about the defendant that would not be admissible before the jury or that was not in fact put before the jury in court.' " *Id.* at 408, 387 A.2d at 1386, *citing United States* v. *Jones,* 542 F.2d 186, 195 (4th Cir.), *cert. denied,* 426 U.S. 922, 96 S. Ct. 2629, 49 L. Ed. 2d 375 (1976), *quoting United States* v. *Hyde,* 448 F.2d 815, 849 (5th Cir. 1971), *cert. denied,* 404 U.S. 1058, 92 S. Ct. 736, 30 L. Ed. 2d 745 (1972). *See also State* v. *Holmes,* 110 Ariz. 494, 520 P.2d 1118 (1974); *Quintana* v. *People,* 158 Colo. 189, 405 P.2d 740 (1965).

Applying the foregoing principles to the case at bar, we find that nothing in the asserted newspaper articles set forth any matter which had not already been presented before the jurors. There was evidence in that case, as was required by the nature of the charges, that defendant had been lawfully committed to the ACI and that he had escaped therefrom. In connection with the nature of the charge of murder, under §11-23-2, as amended by P.L. 1973, ch. 280, §1, the jury was exhaustively instructed concerning the nature and elements of this crime during the voir dire examination of jurors prior to empanelling, as well as in the final instructions given by the trial justice. The statute purported to make the death penalty applicable to "[e]very person who shall commit murder while committed to confinement to the adult correctional institutions * * *." Although a purist in statutory interpretation might disagree with the newspaper summary of the charge, such a subtle distinction would be imperceptible to the average intelligent lay person. We believe that the newspaper acounts of which complaint is made might well be characterized in the words of Judge Russell in *United States* v. *Jones, supra*:

> "With hardly an exception the cases in which substantial prejudicial publicity during the trial was found, the publicity involved 'information about the defendant that would not be admissible before the jury or that was not in fact put before the jury in court.' * * *

> "We have none of that in this case. The newspaper publicity of which the defendants complained was * * * an accurate condensed statement of testimony actually admitted into evidence and heard by the jury. The news accounts did not attempt * * * to evaluate the testimony to the prejudice of the defendants. They included no inadmissible evidence or evidence that was not available to the jury or evidence that either then or later was not fully developed in evidence heard by the jury." 542 F.2d at 195-96.

The foregoing comments are equally applicable to the case at bar. Since no publicity which could remotely be termed prejudicial has been pointed out by defendant, we do not reach the question of the adequacy or correctness of the trial justice's response. It is only under circumstances where the jury has been exposed to prejudicial information that the trial court is obliged, in its sound discretion, to take appropriate measures to assure a fair trial. *United States v. Jones, supra* at 194; *United States v. Pomponio* 517 F.2d 460 (4th Cir.), *cert. denied*, 423 U.S. 1015, 96 S. Ct. 448, 46 L. Ed. 2d 386 (1975); *United States v. Hankish*, 502 F.2d 71 (4th Cir. 1974).

Therefore, since defendant has not shown any reasonable possibility of prejudice from the publicity upon which his challenge is based, his argument on this issue is unavailing.

## IV

### THE CHARGE TO THE JURY

The defendant contends that the trial justice was in error in failing to instruct the jury that it might return a verdict of murder in the second degree or manslaughter. The trial justice, however, declined to give such an instruction and charged the jury only on the elements of murder committed in the course of attempting to perpetrate a robbery.

Three eyewitnesses testified in this case that they saw defendant shoot the victim. One eyewitness, Brenda Page, testified that she saw Cline's hand in the fisherman's pocket at the time of the shooting. Cline's own statement, as admitted into evidence, was in the following unequivocal terms:

> " 'Question, did you have anything to do with the murder of the fisherman?
>
> " 'Answer, yes, I shot him. I killed him. I'm sorry.
>
> " 'Question, why did you kill him?
>
> " 'Answer, I thought he was going to shoot me. People said he carried a gun.

" 'Question, what were you doing when you shot him?

" 'Answer, holding him up.' "

There is not a shred of evidence in the case which would indicate that Cline had any prior relationship or even acquaintance with the victim in this case.

Our court has long followed the doctrine that instructions should not be given on lesser degrees of murder or manslaughter unless there is evidence in the case to support such a finding. *State v. Saccoccio*, 50 R.I. 356, 147 A. 878 (1929). This rule has been consistently followed in more recent cases. *State v. Infantolino*, 116 R.I. 303, 355 A.2d 722 (1976); *State v. Bradshaw*, 101 R.I. 233, 221 A.2d 815 (1966). Our observation in *Infantolino, supra,* is pertinent:

> "A charge to the jury should be confined to propositions of law related to material issues of fact which the evidence tends to support. The jury's attention should not be directed to various propositions of law unless the record contains evidence which supports and requires it." *Id.* at 307, 355 A.2d at 724-25.

A consideration of the evidence in this case would find no basis to support a finding of murder in the second degree or manslaughter. Either defendant was guilty of murder in the course of attempted perpetration of a robbery, or he was guilty of no crime at all. In charging the jury on the elements of the only crime which could be inferred from the evidence, the trial justice was wholly correct and acted in accordance with reason and authority.

## V

## DISQUALIFICATION OF THE ATTORNEY GENERAL'S ENTIRE STAFF

On March 27, 1975, before commencement of trial, defendant moved to disqualify the assistant attorney general, Albert DeRobbio, who had been assigned to try the case. Indeed, the gravamen of defendant's motion was that the entire Attorney General's staff be disqualified and a special

prosecutor appointed to proceed with the trial. The basis of this motion was that defendant's former attorney, Walter Stone, had become employed by the Department of the Attorney General. There is no question that attorney Stone had been active in the handling of matters relating to Cline's defense, including but not limited to the extensive motion to suppress which had been heard over a period of 9 days. It must be presumed that Stone had become privy to all matters relating to the Cline defense prior to his departure from employment with the office of the Public Defender where he had been assigned to represent defendant. In fact, Stone did not leave the Public Defender's office until February 7, 1975. The instant motion was made on March 27, 1975.

It is further true that the Canons of Professional Ethics and Disciplinary Rules of this court forbid an attorney from disclosing matters which have been confidentially imparted to him to the disadvantage of his client. Specifically, DR 4-101(B) provides:

"(B) Except as permitted by DR 4-101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure."

The foregoing disciplinary rule is designed to implement Canon 4 of the Code of Professional Responsibility, and particularly the following pertinent portions:

"EC 4-5. A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes.

"EC 4-6. The obligation of a lawyer to preserve the confidences and secrets of his client continues after the termination of his employment."

The fact pattern in this case does not in any way indicate that attorney Stone breached his obligation as set forth in the foregoing canons or disciplinary rules. Indeed, it might be helpful to note the representations of fact made by assistant attorney general DeRobbio during the course of argument on this motion, in conjunction with an exchange which took place between the trial justice and the attorney for defendant:

> "THE COURT: So that you don't even have suspicion he might convey any information he received from the defendant, is that correct?

> "MR. POLLOCK: Your Honor, what we are challenging, as well as the appearance of impropriety—

> "THE COURT: That's not my question. My question is: are you saying you don't even have the suspicion at the present time? I know you're challenging the appearance of impropriety, but I am asking you if you have a suspicion he may convey any knowledge? That's a simple question.

> "MR. POLLOCK: No, Your Honor, only through the appearance, as I said. * * *"

> * * *

> "MR. DeROBBIO: If Your Honor please, I have summonsed Mr. Stone, and I believe * * * perhaps an examination of Mr. Stone should be made by either the Court or by the attorney for the defendant, and I feel a determination as to what his participation was with this defendant in disclosing any of the facts and what his participation is with the Attorney General's Department and a statement from Mr. Stone as to any conversations that he may have engaged in with the Office of Attorney General; and I can state presently to this Court, as an officer of the court, that Mr. Stone has refused even to discuss the matter as to the assignment date of the case itself—in no way has Mr. Stone in any way indicated any of the factual situation, any of the knowledge that he has received through his attorney-client privilege."

In the face of this colloquy, there was no attempt by defendant to show or even suggest, as a matter of fact, that Stone had violated his ethical responsibilities in any way.

The defendant contends in his brief that even in the absence of any evidence of violation of confidence, the entire Attorney General's office should have been disqualified in order to avoid the appearance of impropriety. In support of this proposition defendant cites *State v. Latigue*, 108 Ariz. 521, 502 P.2d 1340 (1972), and *State v. Chambers*, 86 N.M. 383, 524 P.2d 999 (N.M. Ct. App.), *cert. denied*, 86 N.M. 372, 524 P.2d 988 (1974). In both of the foregoing cases it was held that the office of the prosecutor, in the first instance in the county attorney's office and in the second instance the county district attorney's office, should be disqualified from trying the case against a defendant whose former counsel had subsequently become associated with the office of the prosecuting authority. Both courts selected this result in order to avoid the appearance of impropriety. In the *Latigue* case, *supra*, it is interesting that the Supreme Court of Arizona, in dealing with a case in which the defendant's prior co-counsel had become chief deputy county prosecutor, commented as follows on the necessity of the appointment of a special prosecutor:

> "It is, of course, necessary that the County Attorney secure the appointment of a special prosecutor if he wishes to continue the prosecution of this case. The record indicates that the trial court has agreed to take this matter under advisement until the opinion of this court has been made available to it.

> "As a part of the trial court's order in this case, there should be included specific directions as to what material shall be made available to the new special prosecutor. This may include any material that the County Attorney has obtained from sources *completely independent of his chief deputy*—police investigations and reports, confessions, items of evidence, etc., if any, used in the murder, coroner's report, statements of witnesses taken outside the presence of the chief deputy,

etc. There is no reason to require a complete new investigation. The order should also specifically prohibit use of any of the work-product of any other item having any possible connection with the chief deputy. It should prohibit any discussion between the chief deputy and the special prosecutor. Every possible effort should be made to prevent any evasion, or appearance of evasion, deliberate or accidental." 108 Ariz. at 523, 502 P.2d at 1342.

It should be noted that even after the elaborate precautions, it would be necessary to trust to the integrity of the lawyers in question to obey that which would have been their obligation in any event to avoid the revealing of confidences made by the client to his former attorney.

Another line of cases has declined to require the disqualification of an entire prosecutorial office because of prior association of one member with a defendant. In *State* v. *Brazile*, 231 La. 90, 90 So. 2d 789 (1956), the Supreme Court of Louisiana overturned a trial court order to recuse the district attorney and his assistants for the reason that the second district attorney had served as one of defense counsel at a prior trial. The court emphasized that there was no reason to believe that the defendant's prior counsel had violated the confidential relationship existing between attorney and client. Although the court was construing a statute which set forth causes for recusation, one of the pertinent grounds was if the district attorney " 'shall have been employed or consulted as attorney for the accused before his election or appointment as district attorney * * *.' " *Id.* at 94, 90 So. 2d at 790. In construing this statute the court observed that neither the district attorney nor his first assistant had ever been employed or consulted as attorney for the defendant. The court said that this statutory provision would furnish no ground at all for the recusation of the district attorney or his first assistant.

This case has been followed by *State* v. *Brown*, 274 So.2d 381 (La. 1973), wherein the Supreme Court of Louisiana

again refused to recuse or disqualify the district attorney's office in a situation in which that office had employed an assistant district attorney who had previously represented the accused. In that case the court commented as follows:

"The mere fact that an assistant district attorney previously represented an accused does not *ipso facto* require disqualification of the District Attorney in the criminal proceeding. Especially, as here, where the Assistant District Attorney was not called upon to use against his former client any confidential knowledge gained through their former association, no prejudice could result to the accused." *Id.* at 382.

In New Mexico following the decision in *State v. Chambers, supra,* the court of appeals in *State v. Mata,* 88 N.M. 560, 543 P.2d 1188 (N.M. App. 1975), reached a somewhat different conclusion when, after an evidentiary hearing, the trial court made unchallenged findings of fact that an attorney who had previously represented the defendant and later was employed as an assistant district attorney never discussed the case with the district attorney or any of his assistants or employees and took no part in the trial or preparation for trial on behalf of the prosecution. In the light of these findings of fact, on an application for post-conviction relief, the court held that any appearance of unfairness or impropriety was dissipated.

In *State v. Miner,* 128 Vt. 55, 258 A.2d 815 (1969), an assistant attorney general had previously represented the accused in a murder indictment. The Attorney General withdrew from the case, and the prosecution was entrusted to the Windsor County State's Attorney. Thereafter, the defendant sought to dismiss the indictment. In sustaining the lower court's refusal to dismiss the indictment, the Supreme Court of Vermont considered that the county state's attorney had worked in close relationship with the Attorney General's office in the preparation of the case for trial, but at no time had he conferred with the former counsel of the defendant. After taking into account the ethical responsibilities of counsel, the court made the following comment:

"Fidelity to these standards prohibits an attorney from engaging in a criminal proceeding against an accused he has formerly represented in the subject matter of the prosecution. But a conflict of this consequence will not bar the State, as distinguished from a disqualified representative, from protecting the public interest. Other counsel who have not been subject to any conflict may appear for the State where the prosecutor's function can be performed impartially and free from any breach of privileged communications. *Id.* at 62, 258 A.2d at 819.

There is no doubt that an attorney who has represented a defendant may not serve as his prosecutor. The cases on this point are virtually unanimous. *See* Annot., 31 A.L.R. 3d 953 (1970). The question at issue here is whether the entire Attorney General's office in a state where only that officer carries the burden of the prosecutorial function in respect to felonies should be disqualified merely because one of its subordinate members has previously represented the accused, particularly since there is no suggestion that he has violated the confidence of his former client or participated in the preparation of the case in any way. After considering the above cited authorities, we believe that the answer to this question must clearly be in the negative. Even in those states where one prosecutor's office has been disqualified, the necessity still exists for representatives of that office, as in *State.* v.ʼ *Latigue, supra,* to work closely with a special prosecutor in whose integrity (and that of the former counsel for the accused) reliance must ultimately have been reposed. Thus, we believe that transferring responsibility from one office to another, or the appointment of a special prosecutor, provides a purported remedy which is more cosmetic than substantial. Essentially the question is whether defendant has been in any way prejudiced by virtue of the imparting of knowledge from his former counsel to anyone involved in his prosecution. On this record, there was no suggestion of any such prejudice. Indeed, it was conceded for all practical purposes that no breach of confidence had occurred. Therefore, the trial justice was correct in refusing to disqualify DeRobbio from proceeding with the trial of the case.

## VI

## *THE IN-COURT IDENTIFICATION*
## *BY RONALD STONE*

During the course of trial, defendant sought to exclude an in-court identification by Ronald Stone, an eyewitness to the shooting, on the ground that the police had utilized suggestive procedures at the pretrial lineup and also at a photographic display which preceded the lineup. In support of his argument, defendant cites *Manson* v. *Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) and *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). In both of these cases suggestive procedures had been used, but the court permitted in-court identification in both instances on the ground that the totality of circumstances supported the reliability of the identification. In *Manson*, an experienced undercover police officer had only been shown a single photograph, but the Supreme Court, concluding that reliability is the linchpin, determined that under all of the circumstances they could not say that there was " 'a very substantial likelihood of irreparable misidentification,' " 432 U.S. at 116, 97 S. Ct. at 2254, 53 L. Ed. 2d at 155, *citing Simmons* v. *United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968). In *Biggers*, a showup where the defendant was presented to the victim alone was found to be suggestive, but the Supreme Court still permitted an in-court identification when the record indicated that there was sufficient reliability to overcome a substantial likelihood of misidentification. These cases applied principles first asserted in *Stovall* v. *Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), where an individual showup to a victim of a stabbing was held to be justified by necessity.

We note that in all of the foregoing cases the element which triggered scrutiny by the Court was suggestiveness. The suggestiveness might have been overcome by other factors but was present in the first instance in order to provide the court with a reason for considering exclusion of an in-court identification.

In the present case Ronald Stone was shown not a single photograph, but seven. The trial justice specifically found that the photographs were remarkably fair in terms of showing alternative persons who were similar in appearance. He did not find any suggestiveness in the photographic display. We have carefully reviewed the transcript of the preliminary hearing and agree wholly with the findings of the trial justice. Mr. Stone, in spite of searching cross-examination, testified unequivocally that he had known Cline prior to the shooting, knew his name, had seen him "five or six times" at the Chad Brown Project. He insisted that the police did not suggest to him whose photograph should be selected. It is apparent from the record that he picked Cline's photograph from the group without assistance from anyone.

The lineup itself was practically a model of adherence to constitutional precepts. Indeed, no Sixth Amendment claim is made in respect to this pretrial confrontation, because it was conceded at the preliminary hearing that attorney Hoopis was present during the course of the lineup. There were four persons in the lineup, all others of whom were found by the trial justice to be reasonably similar in coloring and hair styles to defendant. The trial justice found nothing suggestive about the lineup. He further found that the officers were "seeking to be scrupulously fair" in refraining from making suggestions to Mr. Stone.

In light of this record, we are of the opinion that none of the elements of suggestiveness were present which would have justified an exclusion of the in-court identification, even in the event that the witness had not indicated an independent source for such identification as was shown in this case. In short, the trial justice was correct in refusing to exclude Stone's identification.

## VII

### THE ISSUE OF CONSOLIDATION FOR TRIAL OF THE ESCAPE CHARGE AND THE MURDER CHARGE

The defendant had been separately indicted for escape and for murder. Although the two charges had not been consolidated, they were assigned to be tried together. Prior to trial, defendant sought a severance of these two charges on the ground that the trial justice should exercise his discretion in favor of severance in order to avoid prejudice to defendant.

For the first time on appeal, defendant not only challenges the judge's exercise of discretion, but claims that the trial justice was wrong as a matter of law pursuant to the terms of Rules 8 and 13 of the Superior Court Rules of Criminal Procedure in allowing these two charges to be tried together. It is a familiar principle that only those issues raised at trial will be considered by this court on appeal. *State* v. *Turley,* 113 R.I. 104, 318 A.2d 455 (1974); *State* v. *Quattrocchi,* 103 R.I. 115, 235 A.2d 99 (1967).

In the case at bar, defendant's contention would be unavailing, even if the trial justice's ruling had been sought and obtained on this issue. Super. R. Crim. P. 8(a) reads in pertinent part:

> "Joinder of Offenses. Two (2) or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on *two* (2) or *more acts or transactions connected together* or constituting parts of a common scheme or plan." (Emphasis added.)

In the case at bar defendant was charged in Indictment No. 74-656 that he "being a prisoner confined in the minimum custodial unit of the Adult Correctional Institutions did escape from said minimum custodial unit * * *." The defendant was charged in Indictment No. 74-657 with the following offense:

> "That Robert Cline * * * did murder one Frank A. Pirri while committed to confinement to the Adult Correctional Institutions in violation of §11-23-1 and §11-23-2, Reenactment of 1969, as amended."

Although the escape alleged in one indictment took place on March 16, 1974, and the murder allegedly took place on April 11, 1974, an analysis of the circumstances will disclose that these two events were connected together so as to permit joinder under the terms of Rule 8. In the classic sense the evidence of one event would be mutually admissible in proof of a necessary element of the second event. The importance of evidence which is mutually admissible has been stated in *McKnight* v. *State*, 280 Md. 604, 375 A.2d 551 (1977):

> "The reasoning behind the rule permitting a joint trial of crimes where the evidence would be mutually admissible is evident. Where evidence of one crime would be admissible at a separate trial of another charge, a defendant will not suffer any additional prejudice if the two charges are tried together. It is equally clear, however, that where offenses are joined for trial because they are of similar character, but the evidence would not be mutually admissible, the prejudicial effect is apt to outweigh the probative value of such evidence." *Id.* at 610, 375 A.2d at 555.

The Maryland court indicated that this rule was more stringent than the rule enunciated by Judge Learned Hand in *United States* v. *Lotsch*, 102 F. 2d 35, 36 (2d Cir.), *cert. dened*, 307 U.S. 622, 59 S. Ct. 793, 83 L. Ed. 1500 (1939), and further refined in *Drew* v. *United States*, 118 U.S. App. D.C. 11, 331 F.2d 85 (D.C. Cir. 1964), where the court said:

> "In summary, then, even where the evidence would not have been admissible in separate trials, if, from the nature of the crimes charged, it appears that the prosecutor might be able to present the evidence in such a manner that the accused is not confounded in his defense and the jury will be able to treat the evidence relevant to each charge separately and distinctly, the trial judge need not order severance or election at the commencement of the trial. If, however, it appears at any later stage in the trial that the defendant will be embarrassed in making his defense or that there is a possibility that the jury will become or has become

confused, then, upon proper motion, the trial judge should order severance." *Id.* at 17-18, 331 F.2d at 91-92.

If one applies the more stringent of these two rules, it becomes apparent that a necessary element of proof in the murder indictment was that defendant at the time of the alleged crime was "committed to confinement to the Adult Correctional Institutions." Indeed, in order to avoid going into the details behind this confinement, defendant offered to stipulate thereto. However, this understandable desire to render the circumstances of the offense more antiseptic would not eliminate the need of the state to explain to a jury how a defendant who was committed to confinement at the ACI could have been present at the Chad Brown Housing Project on April 11, 1974.

The state is entitled in any criminal prosecution to present all evidence to the jury which is relevant to the charge. When courts speak of the prejudicial effect of introduction of evidence of other crimes, they are applying a rule which is designed to prevent a jury from finding the defendant guilty of a crime because of his general criminal disposition. In criticizing the test set forth in *Drew* v. *United States, supra,* the Maryland Court of Appeals noted that the *Drew* test "overlook[ed] the reason underlying the 'other crimes' rule, which excludes evidence relevant to proof of criminal disposition because such evidence is generally more prejudicial than probative." 280 Md. at 611, 375 A.2d at 555. This is another way of stating that evidence of the commission of other crimes with certain exceptions is simply not relevant to the proof of guilt of the specific crime with which the defendant is charged. When such evidence becomes relevant to the proof of an issue provable in a case, then the inhibition is no longer applicable. *See, e.g., State* v. *Colangelo,* 55 R.I. 170, 179 A. 147 (1935). In this case the proof of escape from the ACI was highly relevant to explain to the triers of fact how defendant could simultaneously be in a status of commitment to the ACI, and yet, apparently, be at liberty in the city of Providence. The defendant suggests in

his brief that various speculative (and incorrect) explanations might have occurred to the jury which would have been more advantageous to defendant than the actual facts of the case. We know of no doctrine in the law that is designed to insulate defendant from relevant truths, even if such truths might lead the jury to draw less favorable inferences concerning defendant than if they were not exposed. In this case the balancing of prejudice against probative necessity must inevitably lead to the conclusion that evidence concerning the background of defendant's presence at the Chad Brown Housing Project on April 11, 1974, would be admissible under the murder indictment. This evidence would include an account of his having escaped on March 16, 1974. Even defendant does not contend that evidence of the escape would not be relevant to the escape indictment. Therefore, the same evidence would be mutually admissible in each case and these offenses could properly have been joined under the provisions of Rule 8. Since the offenses could have been joined in a single indictment, they could be tried together under the provisions of Rule 13, which provides that the "Court may order two (2) or more indictments * * * to be tried together if the offenses * * * could have been joined in a single indictment * * *."

Therefore, in causing these indictments to be tried together, the trial justice was not violating the rules of criminal procedure as a matter of law.

In respect to the decision of the trial justice to exercise his discretion in favor of joinder, we have repeatedly held that the exercise of such discretion will not be disturbed on review absent a clear abuse. *State* v. *Johnson*, 116 R.I. 449, 358 A.2d 370 (1976); *State* v. *Mattatall*, 114 R.I. 568, 337 A.2d 229 (1975); *State* v. *Patriarca*, 112 R.I. 14, 308 A.2d 300 (1973). In *Patriarca*, the late Chief Justice Roberts discussed the balance of prejudice resulting from joinder with the efficiency and convenience of a single trial and went on to note that real prejudice is something more than mere disadvantage. It should be noted that in controlling the introduction of evidence on the issue of escape, the trial

justice excluded any and all reference to the reason for defendant's confinement, limiting the testimony of the Superior Court clerk only to those facts which were essential to show that he had been lawfully committed and was in such status on the dates relevant to the charges contained in the indictments. Thus, the trial justice exercised every effort to limit prejudice, even while permitting essential proofs.

In this case it is highly doubtful that defendant was even disadvantaged, since no evidence was admitted under joinder which would not have been admitted if the murder charge had been tried separately. Therefore, the trial justice did not abuse his discretion in ordering that these indictments be tried together.

As a corollary of his argument concerning joinder, defendant further contends that the phrase "while committed to confinement" and the reference to §11-23-2, as amended by P.L. 1973, ch. 280, §1, constituted improper and unduly prejudicial matter which should have been stricken from the murder indictment. In support of this argument, defendant cites *Government of Virgin Islands* v. *Castillo*, 550 F.2d 850 (3d Cir. 1977), in which interpreting a statute of the Virgin Islands relating to enhanced punishment for one who was in possession of an unregistered firearm, where such defendant had been previously convicted of a felony, the court held that evidence of the prior offense was solely for the court and not for the jury and, therefore, was not relevant to the jury's consideration.

However much persuasive force this case might have in respect to prior offenses under the statute then in issue, and we specifically decline to comment upon that element, it can have no application in respect to the determination of a clear factual matter which is, like any other fact, for the jury to determine. It is true that the issue of the defendant's status of confinement had a bearing upon penalty. It is also true that in respect to homicide generally, the severity of the homicide (whether manslaughter, murder in the second degree, or murder in the first degree) will in each instance affect the

severity of the punishment. Under §11-23-1, as amended by P.L. 1974, ch. 118, §5, in order to find a defendant guilty of first-degree murder, it will be imperative for the jury to determine as a question of fact whether the elements necessary to establish this offense have been proven. We believe that it is no less a question of fact to determine whether the defendant was "committed to confinement" than to determine whether the defendant committed murder in the perpetration of, or attempt to perpetrate, robbery. Both of these elements would affect the ultimate penalty imposed but must be determined as a matter of fact before the penalty can be imposed. This has been recognized in federal practice where the punishment for a crime is dependent on the amount of money involved. Under such circumstances the court may require the jury to determine the amount. *Jalberg* v. *United States*, 375 F.2d 125 (5th Cir.), *cert. denied*, 389 U.S. 899, 88 S. Ct. 225, 19 L. Ed. 2d 221 (1967); *see* Wright & Miller, *Federal Practice and Procedure: Criminal* §512 at 366 (1969). In adding the element "while committed to confinement" to the crime of murder, the Legislature had created a separate and distinct offense for which it provided a special and mandatory penalty. Even though that penalty of execution has been determined to be constitutionally impermissible, the intention of the Legislature to create a specific and separate category of crime is clear. Thus, the trial justice was not in error in declining to strike this element from the charge.

For the foregoing reasons, the defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the papers in the case are remanded to the Superior Court.

*Dennis J. Roberts II*, Attorney General, *Nancy Marks Rahmes, Thomas H. Caruolo*, Special Assistant Attorneys General, for plaintiff.

*William F. Reilly*, Public Defender, *Barbara Hurst*, Chief Appellate Attorney, *John A. MacFayden III*, Assistant Public Defender, for defendant.